IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ETC NORTHEAST PIPELINE, LLC, | CASE No. _____ |
| Plaintiff and Counterclaim Defendant, | |
| vs. | **NOTICE OF REMOVAL** |
| EM ENERGY PENNSYLVANIA, LLC, | |
| Defendant and Counterclaim Plaintiff. | |

Plaintiff and Counterclaim Defendant ETC Northeast Pipeline, LLC ("ETC"), by its attorneys, hereby files this Notice of Removal (the "Notice of Removal") pursuant to 28 U.S.C. § 1452(a) and Rule 9027 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to be referred to the United Stated Bankruptcy Court for the Western District of Pennsylvania (the "Pennsylvania Bankruptcy Court") pursuant to that certain Order of Reference of Bankruptcy Cases and Proceedings *nunc pro tunc* dated October 16, 1984, and thereafter for transfer to the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"), to be heard in connection with those certain related bankruptcy cases pending as *In re EdgeMarc Energy Holdings, LLC et al.*, jointly administered as case no. 19-11104 (the "Delaware Bankruptcy Cases"). The grounds for removal include:

1. ETC served a complaint (the "Complaint") against EM Energy Pennsylvania, LLC ("EdgeMarc Pennsylvania"), a debtor in the Delaware Bankruptcy Cases, that initiated litigation in the Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division (the "PA State Court"), Case No. 19-002052 (the "PA State Court Action") on or about February 7, 2019. A copy of the Complaint is attached hereto as **Exhibit A**, and all other pleadings on file in the PA State Court Action are attached as **Exhibits B - Q**.

2.     On May 15, 2019 (the "Petition Date"), EdgeMarc Energy Holdings, LLC ("EdgeMarc") and eight affiliated debtors (each a "Debtor" and collectively, the "Debtors"), including EdgeMarc Pennsylvania, filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the Delaware Bankruptcy Court, which initiated the Delaware Bankruptcy Cases. The Delaware Bankruptcy Cases are presently pending with the Honorable Brendan Linehan Shannon, United States Bankruptcy Judge presiding.

3.     The Complaint seeks, *inter alia*, a judgment declaring that certain Amended and Restated Gathering Agreement (the "Base Agreement") and certain Individual Transaction Confirmations ("ITC") entered into by and between ETC and EdgeMarc Pennsylvania are valid and enforceable contracts. The Complaint alleges that EdgeMarc Pennsylvania breached the ITCs by repudiating them without justification or excuse, and that EdgeMarc Pennsylvania was unjustly enriched thereby. All of these allegations are stated more fully in the Complaint.

4.     On February 27, 2019, EdgeMarc Pennsylvania filed its Answer, New Matter and Counterclaims (the "Counterclaims") in response to the Complaint. *See* Exhibit D. The Counterclaims include EdgeMarc Pennsylvania's breach of contract and declaratory judgment claims against ETC.

5.     Section 1452 of Title 28 provides, in part, that a party may remove any claim or cause of action in a civil action to the district court if such district court has jurisdiction pursuant to section 1334 of Title 28.  In turn, Section 1334(b) of Title 28 provides, in pertinent part, that a district court's jurisdiction extends to those civil proceedings that "arise under," "arise in" or are "related to" a case filed under the Bankruptcy Code.

6.     The PA State Court Action is subject to removal pursuant to the jurisdiction of the

United States District Courts over civil proceedings arising in, arising under, or related to cases

under 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). 28 U.S.C. §§ 1334(b) and 1452.

7.     In the Third Circuit, under reasoning later adopted by the Supreme Court of the

United States, a case relates to a bankruptcy proceeding if the outcome of that proceeding could

conceivably have any effect on the estate being administered in bankruptcy. *Superior Contracting*

*Gp. Inc. v. Rachmale (In re LTC Hldgs., Inc.)*, 587 B.R. 25, 36 n. 58 (describing the "conceivable

effect" test and citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995) and *Pacor, Inc. v.*

*Higgins*, 743 F.2d 984 (3d Cir. 1985)). The test of a "conceivable effect" is met "if the outcome

could alter the debtor's rights, liabilities, options, or freedom of action (either positively or

negatively) and which in any way impacts upon the handling and administration of the bankrupt

estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995).

8.     The Complaint arises in, arises under, or otherwise is related to the Bankruptcy

Cases and is therefore removable under 28 U.S.C. § 1452, because, *inter alia*:

a.  On the Petition Date, the Counterclaims became property of the Debtors'
    estates. *See* 11 U.S.C. § 541. ETC was also stayed from continuing to pursue
    the claims stated in the Complaint. *See* 11 U.S.C. § 362. This litigation
    cannot meaningfully continue outside the Delaware Bankruptcy Court
    without the Delaware Bankruptcy Court's permission. *See* Fed. R. Bankr. P.
    9027.

b.  The Complaint pleads that ETC was damaged by alleged breaches of Debtor
    EdgeMarc Pennsylvania of the Base Agreement and/or the ITCs. A
    determination in this litigation that the ITCs were not properly terminated
    will give rise to a damages claim in favor of ETC against the Debtors.

c.  The Complaint seeks a determination of whether the ITCs have been
    properly terminated by Debtor EdgeMarc Pennsylvania, or alternatively,
    whether such contracts remain executory contracts subject to assumption or
    rejection by the Debtors pursuant to Bankruptcy Code § 365.

    d. The Debtors are currently running a court supervised sale process in their Bankruptcy Cases. Any sale of the Debtors' assets may require the assumption and assignment of the Base Agreement and ITCs to a successful buyer. The outcome of this litigation, namely, adjudicating alleged defaults (whether committed by EdgeMarc Pennsylvania or ETC), rights, claims and terminations of such contracts will impact the Debtors' sale process.

    e. Litigation also exists between ETC and Debtor EdgeMarc Pennsylvania's equity sponsors (the "Sponsors") in state court in New York (the "NY State Court Action") to resolve disputes of fact and law that are inextricably intertwined with those causes of action pleaded in the PA State Court Action in the Complaint and Counterclaims. The PA State Court Action is removed so that a single court decides all of these interrelated disputes. *See DeAngelis v. Corzine*, 501 B.R. 155, 159 (S.D.N.Y 2012) (removal of causes of action that "are, in sum and substance, an echo" of other complaints before the court "renders removal the most efficient and equitable result."). A copy of the complaint in the NY State Court Action is attached hereto as **Exhibit R.** Contemporaneously with this Notice of Removal, ETC is removing the NY State Court Action and seeking the transfer of same to the Delaware Bankruptcy Court.

    9.    As a result, ETC removes the PA State Court Action to this Court under 28 U.S.C. § 1452(a) and Bankruptcy Rule 9027 pursuant to the jurisdiction of this Court under 28 U.S.C. § 1334(b), as a civil proceeding arising under Title 11, or arising in or related to cases under Title 11, namely, the Delaware Bankruptcy Cases.

    10.    Matters "arising under" or "arising in" bankruptcy cases are core proceedings. *See* 28 U.S.C. § 157(b)(1). The PA State Court Action is within the Bankruptcy Court's "core" jurisdiction within the meaning of 28 U.S.C. § 157(b)(1) and (2), because it seeks a determination of the validity and value of ETC's claims against the Debtors. *See* 28 U.S.C. § 157(b)(2)(B). EM Energy PA has already filed the Counterclaims, which are themselves core proceedings. *See* 28 U.S.C. § 157(b)(2)(C). The resolution of the PA State Court Action will seriously affect the assets available to the Debtors' estates for distribution to creditors. *See* 28 U.S.C. § 157(b)(2)(O). The

PA State Court Action further affects the administration of the estate and seeks to adjust the debtor-creditor and debtor-equity security holder relationship. 28 U.S.C. § 157(b)(2)(A), (O).

11.     Even if the PA State Court Action is not a core proceeding, which it is, it is indisputably *related to* the Bankruptcy Cases, and thus, removal to this Court is proper.

12.     This Notice of Removal is filed within 90 days after the Petition Date as required by Bankruptcy Rule 9027(a)(2). This Notice of Removal is timely under Bankruptcy Rule 9027 and 28 U.S.C. § 1452(a).

13.     No previous notice of removal has been filed in this or any other court.

14.     Pursuant to 28 U.S.C. § 1452(a), assignment to the United States District Court for the Western District of Pennsylvania is proper because the PA State Court Action is pending in the PA State Court. As a mechanical matter, it is necessary to remove to the District Court in the jurisdiction where the state court action is pending, for transfer to the court where the bankruptcy matter is pending.

15.     Pursuant to Bankruptcy Rule 9027, the Notice of Removal is accompanied by a copy of all process and pleadings filed in the PA State Court Action, with the exception of any discovery material, and are attached hereto as Exhibits A through Q.

16.     Pursuant to Bankruptcy Rule 9027(a)(1), ETC hereby consents to entry of final orders or judgment by the Delaware Bankruptcy Court.

17.     Upon the filing of this Notice of Removal in the United States District Court for the Western District of Pennsylvania, written notice of removal will be given to EM Energy PA and to the PA State Court. ETC will promptly serve on EM Energy PA and file with the Court of PA State Court a Notice of Filing of Notice of Removal to Federal Court pursuant to Rule 9027.

**WHEREFORE**, ETC requests that upon receipt of this removed action, the United States District Court for the Western District of Pennsylvania, refer this action to the United States Bankruptcy Court for the Western District of Pennsylvania, and thereafter transfer this matter to the United States Bankruptcy Court for the District of Delaware. Separate motions to refer and transfer venue will be filed.

Dated: June 7, 2019

Respectfully Submitted,

Stuart H. Sostmann, PA ID No. 84065
Gregory P. Graham, PA ID No. 317205
MARSHALL DENNEHEY WARNER COLEMAN &
GOGGIN
501 Grant Street, Floor 7
Pittsburgh, PA 15219
Telephone:   412-803-1140
Facsimile:   412-803-1188
SHSostmann@MDWCG.com
gpgraham@MDWCG.com

and

Michael P. Lynn, TX Bar No. 12738500
*Pro hac vice application forthcoming*
Chris Patton, NY Bar No. CP-0320
*Pro hac vice application forthcoming*
John Adams, TX Bar No. 20997277
*Pro hac vice application forthcoming*
LYNN PINKER COX & HURST, L.L.P.
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone:   214-981-3800
Facsimile:   214-981-3839
mlynn@lynnllp.com
cpatton@lynnllp.com
jadams@lynnllp.com

COUNSEL FOR
ETC NORTHEAST PIPELINE, LLC

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on this, the 7th day of June, 2019, a true and correct copy of the forgoing document with all attachments thereto has been served on counsel of record for EM Energy Pennsylvania, LLC by email and first class mail delivery, addressed as follows:

Megan S. Haines
McGuireWoods LLP
Tower Two Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
mhaines@mcguirewoods.com

Adam G. Landis
Kerri K. Mumford
Kimberly A. Brown
Holly M. Smith
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com
brown@lrclaw.com
smith@lrclaw.com

Darren S. Klein
Laura Samet Buchwald
Aryeh E. Falk
Jonah A. Peppiatt
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
darren.klein@davispolk.com
lara.buchwald@davispolk.com
aryeh.falk@davispolk.com
jonah.peppiatt@davispolk.com

_____
Gregory P. Graham, Esq.
PA ID No. 317205
Marshall Dennehey Warner Coleman & Goggin
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219
gpgraham@mdwcg.com

LEGAL/123056992.v1

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC

    Plaintiff,

      v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant.

CIVIL DIVISION

No. GD-19-

**Code:** 180 Declaratory Judgment

**COMPLAINT IN CIVIL ACTION**

Filed on behalf of Plaintiff

Counsel of Record for this Party:

Stuart H. Sostmann, Esquire
Pa. I.D. No. 84065

Gregory P. Graham, Esquire
Pa. I.D. No. 317205

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

shsostmann@mdwcg.com
gpgraham@mdwcg.com

412-803-1140 – phone
412-803-1188 - fax

**JURY TRIAL DEMANDED**



**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC

     Plaintiff,

        v.

EM ENERGY PENNSYLVANIA, LLC

     Defendant.

CIVIL DIVISION

No.  GD-19-

### NOTICE TO DEFEND

     **You have been sued in Court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.**

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

ALLEGHENY COUNTY LAWYER REFERRAL SERVICE
Allegheny County Bar Association
Koppers Building, Suite 400
436 Seventh Avenue, 3rd Floor
Pittsburgh, PA  15219
(412) 261-55558

---

**COMPLAINT**                                      Page 2

IN THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| **ETC NORTHEAST PIPELINE, LLC** | § | **CIVIL DIVISION** |
| | § | |
| Plaintiff, | § | **CIVIL COMPLAINT—Law & Equity** |
| | § | |
| v. | § | |
| | § | **Case No: GD-** |
| **EM ENERGY PENNSYLVANIA, LLC** | § | |
| | § | **Code:** 180 Declaratory Judgment |
| Defendant. | § | |
| | § | |

---

### COMPLAINT IN CIVIL ACTION

---

AND NOW COMES ETC Northeast Pipeline, LLC, by and through its undersigned counsel, Stuart H. Sostmann, Esquire and Gregory P. Graham, Esquire and files the following Complaint in Civil Action ("Complaint"), and in support thereof avers as follows:

## I.  INTRODUCTION

1.  Defendant EM Energy Pennsylvania, LLC ("Defendant") committed to deliver gas under two Individual Transaction Confirmations ("ITCs"). Yet Defendant now contends that the ITCs are unenforceable, because it contends Plaintiff ETC Northeast Pipeline, LLC ("Plaintiff") failed to meet its "Guaranteed In-Service Date."

2.  Under ITC 101 (defined below), the "Guaranteed In-Service Date" was January 1, 2019. Specifically, Plaintiff agreed that by January 1, 2019, it would place specific facilities identified in ITC 101 (i.e., the "Revolution System") in commercial service, which it did.

3.  On September 9, 2018, Plaintiff placed the Revolution System in commercial service.

4.  On September 10, 2018, Plaintiff sent notice to Defendant that the Revolution System had been placed in commercial service on September 9, 2018.

---

**COMPLAINT**                                                                                  **Page 3**

5.  Accordingly, under ITC 101, the "In-Service Date" was October 1, 2018, because ITC 101 defines the "In-Service Date" as the "first Day of the Month following the day on which the Revolution System is completed and placed in commercial service."

6.  Nonetheless, Defendant sent notice purporting to terminate ITC 101 because Plaintiff allegedly failed to meet the Guaranteed In-Service Date. ITC 102 (defined below) is co-terminus with ITC 101, and therefore Defendant's notice also purported to terminate ITC 102.

7.  Plaintiff now seeks declaratory relief for the Court to enter an order recognizing that both ITC 101 and 102 remain in effect.

## II. PARTIES

8.  Plaintiff ETC Northeast Pipeline, LLC is a limited liability company organized under the laws of the State of Delaware with an office located at 6051 Wallace Road Ext., Suite 300, Wexford, Pennsylvania 15090. Energy Transfer LP, indirectly through subsidiaries, owns 100% of the membership interests of ETC Northeast Pipeline, LLC.

9.  Energy Transfer LP ("Energy Transfer") is a publicly traded master limited partnership organized under the laws of the State of Delaware with its principal place of business located at 8111 Westchester Dr., Dallas, TX 75225.

10. A master limited partnership is a limited partnership wherein the limited partnership interests are traded on a securities exchange. A master limited partnership functions in the same capacity as a traditional limited partnership.  Accordingly, for jurisdictional purposes, the citizenship of the master limited partnership is determined by the citizenship of the limited partners of the master limited partnership.  The master limited partnership is considered a resident of each state in which its limited partners reside.  Energy Transfer has in excess of two hundred million publicly traded master limited partnership units, and limited partners in every state.  To remove this case to federal court under such circumstances would be bad faith.

---

**COMPLAINT**                                                                     Page 4

11. Defendant EM Energy Pennsylvania, LLC is a Delaware limited liability company, with its principal office in Canonsburg, Pennsylvania. Defendant develops and operates oil and gas properties and related assets throughout the Appalachian region, including Pennsylvania, and has a place of business at 1800 Main St. Suite 220, Canonsburg, Pennsylvania 15317. Defendant may be served with process at *C T Corporation System 600 North 2nd Street Suite 401 Harrisburg, Pennsylvania 17101.*

## III. JURISDICTION, VENUE, AND GOVERNING LAW

12. Subject matter jurisdiction is proper in this Court under 42 Pa. C.S. § 931 because the action arises under the laws of the Commonwealth of Pennsylvania and is within the subject matter jurisdiction of this Court.

13. Subject matter jurisdiction exists in this case pursuant to the Declaratory Judgments Act, 42 Pa.C.S. Section 7531, et seq.

14. Pursuant to Declaratory Judgments Act, Plaintiff is entitled to a determination that ITC's 101 and 102 remain in force and are in full effect.

15. Pursuant to 42 Pa.C.S. §7537 this Honorable Court must grant Plaintiff declaratory relief because it will terminate any alleged uncertainty or controversy between the parties.

16. All parties with an interest in this Declaratory Judgment matter have been properly identified.

17. Venue in this Court is proper under Pennsylvania Rules of Civil Procedure 1006 & 2179, because Allegheny County is where Defendant regularly conducts business, where this cause of action arose, and where a transaction or occurrence took place out of which this cause of action arose.

18. The Gathering and Processing Agreement and the ITCs at issue in this case are governed by Pennsylvania law. (See Base Agreement attached as Exhibit "A" and ITCs' attached as

Exhibit "B". Exhibits "A" & "B" have been redacted to protect the dissemniation of Plaintiff's and Defendant's confidential and proprietary information).

## IV. FACTUAL BACKGROUND

### A. The Base Agreement

19. On November 13, 2017, the parties entered into an Amended and Restated Gathering and Processing Agreement (the "Base Agreement").

20. The Base Agreement expressly contemplates "Individual Transaction Confirmations" or "ITCs." The ITCs are "subject to the terms and conditions" of the Base Agreement. (Base Agreement at 4).

21. ITCs confirm transactions "for the gathering and processing of Gas or provision of other services to be performed" under the Base Agreement. (Base Agreement at 7).

22. The ITCs establish the "gathering and processing fee(s) . . . for the quantities of Gas . . . gathered and processed" under the Base Agreement. (Base Agreement at 9).

23. Plaintiff agreed "to accept or cause to be accepted on a Firm basis those daily quantities of [Defendant's] Gas as set forth in any Individual Transaction Confirmation." (Base Agreement at 13).

24. The Base Agreement and ITCs "constitute a single integrated agreement." (Base Agreement at 8).

### B. The ITCs

25. At the same time the parties entered into the Base Agreement (November 13, 2017), the parties also executed two Amended and Restated Individual Transaction Confirmations (individually, "ITC 101" and "ITC 102" and collectively, the "ITCs").

26. ITC 101 defines the "In-Service Date":

> The first Day of the Month following the Day on which the LP-Galaxy Gathering (other than laterals to the Sculptor Receipt Point and the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are completed and placed in commercial service shall be the "In-Service Date" hereunder.

(ITC 101 at 3).

27. ITC 101 further specifies that Defendant may terminate ITC 101 if the In-Service Date is not on or before January 1, 2019:

> **FAILURE TO MEET GUARANTEED IN-SERVICE DATE**: If the In-Service Date shall not have occurred by the Guaranteed In-Service Date of January 1, 2019, irrespective of any outstanding or intervening declarations of Force Majeure, then Shipper may terminate this ITC upon written notice to Gatherer within thirty (30) Days of the Guaranteed In-Service Date, and neither Party shall have further obligation to the other hereunder.

(ITC 101 at 5).

28.     ITC 102 is "conterminous with" ITC 101. (ITC 102 at 2).

**C. The In-Service Date —October 1, 2018**

29. Plaintiff completed primary construction of the Revolution System in the spring of 2018, and the Revolution System was mechanically complete and ready to be placed in commercial service on or about June 1, 2018 (the "Ready for Service Date").

30. Yet even though the Revolution System was complete on the Ready for Service Date, the Downstream Transporter into which Defendant is obligated to receive its Gas was not in service. So on the Ready for Service Date, Defendant could not fulfill its obligation under Section 6.3 of the Base Agreement to "accept, or cause to be accepted, at the Delivery Point(s)… the Scheduled Quantity" of Defendant's Gas.

31. Moreover, once the Revolution System was placed In Service, under ITC 101, Defendant must begin making payments for its reserved capacity on the Revolution System on a take-or-pay basis.

32. In a gesture of partnership and to build good will, Plaintiff did not tender the Revolution System for commercial service on the Ready for Service Date. That is, Plaintiff could have elected to place the Revolution System in commercial service on June 1, 2018, but instead waited for Defendant's Downstream Transporter to enter into service.

33. Because plaintiff elected to wait to place the Revolution System into commercial service, Defendant avoided paying millions of dollars of fees.

34. Then, on or about August 23, 2018, Defendant's Downstream Transporter announced that the Federal Energy Regulatory Commission had authorized it to begin service.

35. So with the Downstream Transporter in service, Plaintiff tendered the Revolution System for service to Defendant on or about September 6, 2018. Defendant, however, requested a few additional days for final preparation of its facilities upstream of the Revolution System.

36. On September 7, 2018, Plaintiff and Defendant entered into a letter agreement in which, among other things, the parties acknowledged and agreed that the "LP-Galaxy Gathering (other than lateral to the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point"—i.e. all facilities required to be constructed by Plaintiff to meet the Guaranteed In-Service Date—were complete and "ready to be placed into commercial service."

37. Thereafter, Plaintiff agreed to Defendant's request that it begin receiving Gas for commercial service on the Revolution System on September 9, 2018, and Defendant actually began delivering its Gas into the Revolution System for commercial service on September 9, 2018. As such, Plaintiff placed the Revolution System into commercial service on September 9, 2018.

38. Among other things, Plaintiff executed Transaction Confirmation #9532-202 to purchase line fill gas, such that the Revolution System was not merely In-Service and ready for use—it was actually placed in commercial use.

39. The following day, September 10, Plaintiff sent Defendant written notice confirming that the Revolution System was placed into commercial service the previous day.

40. Accordingly, the first day of the month following September 9, 2018, is October 1, 2018—the In-Service Date under ITC 101.

**D. The Landslide**

41. On September 10, 2018, after the Revolution System went into commercial service on September 9, a landslide occurred causing "an event of Force Majeure."

42. Based on that Force Majeure, Plaintiff notified Defendant of the Force Majeure and advised that it would provide additional information "regarding the resumption of service under the ITC."

**E. Plaintiff's Continued Service**

43. Despite the landslide, Plaintiff continued to provide gas gathering and processing services.

44. In particular, the landslide only affected a relatively short portion of the HPGP—a subpart of the Revolution System.

45. Plaintiff incurred significant expense to install a bypass of the affected portion of the system, allowing Plaintiff to connect the HPGP into another of its nearby gathering pipelines, which enabled Plaintiff to continue to provide Defendant with gathering services to a third party's processing facility. Therefore, the HPGP remained partially operational, and Defendant

continued to deliver gas under ITC 101. Service under ITC 102 was not affected by the event of Force Majeure and continued without interruption.

46. Between September 9, 2018 and January 31, 2019, Defendant delivered significant volumes of Gas to Plaintiff on the Revolution System, following the terms of ITC 101 and ITC 102.

**F. Defendant's Default**

47. Although Defendant continued to take advantage of the services Plaintiff provides under the ITCs, Defendant has refused to pay for those services.

48. Namely, Defendant has refused to pay $400,215.51 for services under ITC 101 from September through November. Additionally, payment for services rendered in December is due ten (10) days from the date of invoice, which were provided to Defendant on February 1, 2019.

49. So on January 17, 2019, Plaintiff sent notices of default regarding Defendant's "outstanding and unpaid invoices."

50. Defendant's default also triggered additional obligations under ITC 101. Namely, under ITC 101, in the event of default, Defendant is required to "provide additional Credit Support within fifteen (15) business days . . . . The additional Credit Support shall be the lesser of: (1) four (4) months of Fees due from Shipper or (ii) the number of months remaining in either or both ITCs.

51. This additional Credit Support equated to $7,378,800 that Defendant was required to obtain and maintain, and which Defendant has not obtained.

### G. Defendant Acknowledges ITC 101 and 102 are Enforceable

52. On January 22, 2019, in response to Plaintiff's default Notices, Defendant wrote that it "will pay the amounts identified in the ITC-102 Notice related to *services actually performed and properly invoiced under ITC-102.*"

53. Defendant disputed errors in the invoices for ITC 101, but never alleged the ITCs were unenforceable.

### H. Defendant Reneges on ITCs 101 and 102

54. On January 29, 2019, Plaintiff followed up on Defendant's past-due invoices. Plaintiff disagreed with Defendant's claimed "errors" in the invoices and advised that Defendant's "refusals to pay the Past Due Invoices . . . are in bad faith and constitute ongoing Events of Default."

55. Only then, after months of continued service under the ITCs and its own acknowledgement of the ITCs enforceability, did Defendant concoct a new excuse. Later, on January 29, 2019, Defendant wrote alleging that ITC 101 and ITC 102 "shall be and hereby [are] terminated effective January 29, 2019."

### I. Defendant Seeks to Deliver Gas

56. Despite its contention that the ITCs are unenforceable, Defendant continues to seek to deliver gas to Plaintiff.

57. Defendant contends that it has "nominated" to deliver gas under the Base Agreement alone.

58. But the Base Agreement cannot operate alone, and without an enforceable ITC, Plaintiff has the right to shut off Defendant's gas services.

---

## V.  CAUSES OF ACTION
### COUNT I:  DECLARATORY JUDGMENT

59. Plaintiff incorporates by reference Paragraphs 1 through 58 of this Complaint as if the same were set forth more fully herein at length.

60. Plaintiff and Defendant have a dispute regarding their rights and obligations under the Base Agreement and ITCs.

61. Plaintiff will show that under the plain language of ITC 101, it satisfied the Guaranteed In-Service Date and, therefore, that the ITCs remain in full force and effect.

62. Defendant has expressly taken the contrary position—that the ITCs are not enforceable and that Plaintiff did not meet the Guaranteed In-Service Date.

WHEREFORE, Plaintiff seeks a judgment: (1) declaring that the Base Agreement, along with ITCs 101 and 102, are valid and enforceable contracts; (2) declaring that the In-Service Date was October 1, 2018, and (3) awarding such costs and other relief as the Court deems just.

### COUNT II:  BREACH OF CONTRACT

63. Plaintiff incorporates by reference Paragraphs 1 through 62 of this Complaint as if the same were set forth more fully herein at length.

64. Plaintiff and Defendant simultaneously entered into and executed the Base Agreement and ITCs, which constitute a valid, binding and enforceable contract. Plaintiff has performed its obligations under the Agreement, and all conditions precedent to recovery have been satisfied or performed.

65. Without justification or excuse, Defendant has willfully and intentionally breached its obligations under the Agreement by failing to pay amounts owed and repudiating the ITCs.

66. Defendant's breach of its contractual obligations has or will proximately cause damage to Plaintiff, for which Plaintiff seeks judgment against Defendant.

---

**COMPLAINT**

WHEREFORE, Plaintiff requests damages, including direct lost profits, in excess of the arbitration jurisdictional limits of the Court, including pre- and post-judgment interest (as provided for by contract, statute, and the Court's equitable discretion), costs, and requests such further relief as the Court may deem appropriate.

### COUNT III: UNJUST ENRICHMENT

67. Plaintiff incorporates by reference Paragraphs 1 through 66 of this Complaint as if the same were set forth more fully herein at length.

68. Defendant obtained a benefit from Plaintiff, because Plaintiff provided gas gathering and processing services to Defendant.

69. Defendant has not compensated Plaintiff for the benefit that it has received, and it is unjust for Plaintiff to have obtained and to retain such benefit.

70. Plaintiff suffered damages as a result of Defendant's unjust enrichment.

WHEREFORE, Plaintiff requests damages in excess of the arbitration jurisdictional limits of the Court, including pre- and post-judgment interest, costs, and requests such further relief as the Court may deem appropriate.

### VI. JURY DEMAND

71. Plaintiff requests that all issues of fact be tried before a jury.

### VII.    RELIEF REQUESTED

Plaintiff requests that this Court, upon final hearing, enter judgment against the Defendant for the following relief:

    (1)     Monetary damages in excess of the arbitration jurisdictional limits of the Court, including actual direct damages, in an amount to be determined at trial;

    (2)     Pre-judgment and post-judgment interest;

---

**COMPLAINT**                                                                                          **Page 13**

(3)    Equitable relief, including a preliminary and permanent injunction;

(4)    Declaratory relief;

(5)    Costs of suit incurred herein; and

(6)    Such other and further relief in law or in equity to which Plaintiff may be justly entitled.

Respectfully submitted,

Stuart H. Sostmann, Esquire
Gregory P. Graham, Esquire
MARSHALL DENNEHEY WARNER COLEMAN
& GOGGIN
501 Grant Street, Floor 7
Pittsburgh, PA 15219
412-803-1140- phone
412-803-1188- fax

**ATTORNEYS FOR PLAINTIFF**

*EXECUTION VERSION*

AMENDED AND RESTATED

GATHERING AND PROCESSING AGREEMENT

BETWEEN

EM Energy Pennsylvania, LLC

AND

ETC Northeast Pipeline, LLC

DATED November 13, 2017

CONTRACT NO. 9532-100



# TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | DEFINITIONS | 1 |
| 2. | SCOPE OF AGREEMENT/TENDER OF GAS | 8 |
| 3. | GATHERING AND PROCESSING FEES | 9 |
| 4. | COMMITTED RESERVES AND SHIPPER'S RESERVATIONS | 9 |
| 5. | PROCESSING | 9 |
| 6. | QUANTITY | 12 |
| 7. | QUALITY | 15 |
| 8. | MEASUREMENT | 17 |
| 9. | BILLING | 20 |
| 10. | WARRANTY | 20 |
| 11. | POSSESSION OF GAS | 20 |
| 12. | TAXES AND ROYALTIES | 21 |
| 13. | REMEDIES/LIABILITY | 21 |
| 14. | CREDIT ASSURANCE | 21 |
| 15. | NOTICES | 22 |
| 16. | FORCE MAJEURE | 24 |
| 17. | TERM AND TERMINATION | 25 |
| 18. | REPRESENTATIONS AND WARRANTIES | 26 |
| 19. | MISCELLANEOUS | 27 |

*EXECUTION VERSION*

### AMENDED AND RESTATED
### GATHERING AND PROCESSING AGREEMENT

ETC Northeast Pipeline, LLC, a Delaware limited liability corporation ("Gatherer"), and EM Energy Pennsylvania, LLC, a Delaware limited liability corporation ("Shipper") enter into this Amended and Restated Gathering and Processing Agreement (together with all Transactions, collectively, this "Agreement") effective as of November 13, 2017 (the "Effective Date").

## W I T N E S S E T H

WHEREAS, Shipper and Gatherer are parties to that certain Gathering and Processing Agreement, dated April 17, 2015 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restate the Original Agreement, on the terms and conditions set forth herein;

WHEREAS, Shipper owns or controls quantities of Gas produced from certain oil and gas properties located in the State of Pennsylvania, for which Shipper will require gathering and processing services; and

WHEREAS, Gatherer desires to gather and process Shipper's Gas, and Shipper desires for Gatherer to gather and process such Gas from specified points of receipt.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows.

### ARTICLE I
### DEFINITIONS

1.1     Specific Defined Terms.  As used throughout this Agreement including the Exhibits hereto, the following capitalized terms shall have the meanings ascribed below.

"Adequate Assurance of Performance" has the meaning set forth in Section 14.1.

"Affiliate" and "Affiliates" means, with respect to any relevant Person, any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or under common control with such relevant Person.  For purposes of this definition, the term "control" (including its derivatives and similar terms) means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the relevant Person, whether through the ownership or control of voting interest, by contract or otherwise. Notwithstanding the foregoing, Shipper has informed Gatherer that its indirect and controlling owners, funds managed by the Merchant Banking Division of Goldman Sachs and Ontario

Teachers Pension Plan, and their respective Affiliates (collectively, "Sponsors") (i) are engaged in the business of and invest in multiple companies that are, among other things, both engaged in the business of and invest in exploring for, producing, gathering, transporting, treating and/or processing oil and/or gas (a "Portfolio Company" and collectively the "Portfolio Companies"), (ii) that Sponsors may have a direct or indirect interest in some or all of such Portfolio Companies, and (iii) that such Portfolio Companies operate and engage in the oil and gas exploration, production, gathering, transportation, and treatment business independently from Seller. As such, Gatherer acknowledges and agrees that for purposes of this Agreement, Sponsors and any Portfolio Company shall not be considered an Affiliate of Shipper.

"Agreement" shall have the meaning set forth in the Preamble.

"Area of Dedication" means the area shown on Appendix 1 of any ITC.

"Btu" means the amount of energy required to raise the temperature of one pound of pure water one degree Fahrenheit (1°F) from fifty-nine degrees Fahrenheit (59°F) to sixty degrees Fahrenheit (60°F).

"Business Day" means any day except Saturday, Sunday or Federal Reserve Bank holidays.

"C3+" means all Plant Products other than ethane.

"CCT" shall mean Central Clock Time and is defined as current time in the Central Time Zone taking into consideration the seasonal changes back and forth between Daylight Savings and Standard time.

"Committed Reserves" means Shipper's Interest and any other area that the Parties may in the future mutually agree to add to this Agreement.

"Component Plant Products" is defined in Section 5.2, sub-paragraph 3.

"Component Recovery Factor" means the fixed percentage of each Component Plant Product deemed to be recovered at the Plant pursuant to this Agreement and listed in the applicable ITC.

"Condensate" means any hydrocarbon produced from a well which is measured and delivered into the Gathering System at a Receipt Point as Gas but during transportation in the Gathering System experiences a phase change to a liquid state and is subsequently recovered as a liquid.

"Contract Year" means the 365 consecutive Days (or 366 consecutive Days if Contract Year includes a leap year (February 29)) beginning on the first Day of the Month subsequent to the Initial Delivery Date, or if the Initial Delivery Date occurs on the first Day of a Month, then such first Day, and each of the anniversaries thereafter.

"Day" means a period of twenty-four (24) consecutive hours, beginning at 9:00 a.m. CCT on any calendar Day.

"Delivery Point(s)" means the point(s) identified in the applicable ITC at which Gatherer is to deliver, and Shipper or Shipper's market is to receive, the Residue Gas.

"Downstream Transporter" means any pipeline directly connected downstream of the Delivery Point(s).

"Effective Date" shall have the meaning set forth in the Preamble.

"Ethane Delivery Point" has the meaning set forth in Section 5.3.

"Event of Default" or "Default" means the occurrence of any of the following events, circumstances or conditions: (i) failure by either Party to materially perform or comply with any material agreement, covenant, obligation or other provision contained in this Agreement when either (A) such failure has not been cured within the greater of a reasonable period of time or thirty (30) Days; in each case, following the Party in Default receiving written notice thereof from the Party not in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's failure to perform), or (B) an effort to remedy such failure has not been commenced within such period following such written notice and continued to be diligently prosecuted, with such measures reasonably expected to cure any such Default; (ii) the entry of any Party into voluntary or involuntary bankruptcy, receivership or similar protective proceedings; (iii) the material inaccuracy or breach of any representation or warranty contained herein when such failure either has not been cured within the greater of a reasonable period of time or thirty (30) Days following receipt of written notice thereof by the Party in Default, or (iv) failure to pay any amounts owed pursuant to this Agreement within thirty (30) Days after the applicable due date, other than amounts disputed in good faith pursuant to the provisions of Section 9.2.

"Firm" or "Firm Service" as used herein means that the gathering and processing of Gas up to the Shipper's Reserved Capacity is not subject to a prior claim by another shipper or class of shipper or service.

"FL&U" means the combination of Fuel, Lost and Unaccounted for Gas, and Condensate.

"Fuel" is that quantity of Gas, in MMBtu, used by Gatherer for fuel in the provision of services such as gathering, conditioning, treating, dehydrating and/or compressing the Gas on the Gathering System.

"Force Majeure" shall have the meaning set forth in Section 16.1.

3

"Gas" means methane and other gaseous hydrocarbons, including gaseous combustible, noncombustible, and inert elements, compounds, components or mixtures thereof and liquefiable hydrocarbons in the vapor stream produced at the wellhead, including gas separated or flashed from oil or condensate after production.

"Gas Imbalance Account" means the record of the cumulative variance between the volume of Gas delivered at the Delivery Point(s) for Shipper's account and the volume of Gas received at the Receipt Point(s) (less any FL&U and PTR).

"Gathering and Processing Fee(s)" shall have the meaning set forth in Section 3.1.

"Gathering System" means the existing Gas gathering pipeline system owned and operated by Gatherer or an Affiliate of Gatherer and/or the Gas gathering pipeline system to be constructed by Gatherer, as described in the applicable ITC.

"Gross Heating Value" means the number of Btu's liberated by the complete combustion, at constant pressure, of one (1) cubic foot of Gas at a base temperature of sixty degrees Fahrenheit (60°F.) and a referenced pressure base of fourteen and seventy-three hundredths (14.73) Psia with air of the same temperature and pressure of the Gas, after products of combustion are cooled to the initial temperature of the Gas, and after the water of the combustion is condensed to the liquid state. The Gross Heating Value of the Gas shall be corrected for the water vapor content of Gas being delivered provided, however, that if the water vapor content of the Gas is seven (7) pounds or less per one million (1,000,000) cubic feet, the Gas shall be assumed to be dry and no correction shall be made.

"Individual Transaction Confirmation" or "ITC" means an effective and unexpired agreement between Gatherer and Shipper documented by written means, evidencing the specific terms of a Transaction, which may be in any form adequate at law, but which shall be subject to the terms and conditions of this Agreement.

"Initial Delivery Date" means the first date on which Shipper delivers any Gas to Gatherer at the Receipt Point(s) pursuant to the applicable ITC.

"Inlet Volume" is defined in Section 5.2, sub-paragraph 1.

"Interruptible" or "Interruptible Service" as used herein means that Gatherer, in its sole and unfettered discretion, shall have the right to interrupt, curtail or suspend the receipt, gathering, processing or delivery of Gas hereunder at any time and from time to time without any liability to Shipper by reason thereof, subject to Section 6.7.

"Laws" mean any laws, rules, regulations, decrees and orders of the United States of America and all other governmental bodies, agencies or other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by this Agreement or the Parties or their operations, whether such Laws now exist or are hereafter amended or enacted.

4

"Loss" or "Losses" means, unless specifically provided otherwise, all claims, including, but not limited to, those for bodily injury or death, personal injury, illness, disease, maintenance, cure, loss of parental or spousal consortium, loss of support, wrongful death, property damage and wrongful termination of employment, damages, liabilities, losses, demands, liens, encumbrances, fines, penalties, costs for removal of wreck/debris, causes of action of any kind (including actions in rem or in personam), obligations, costs, judgments, interest and awards (including payment of reasonable attorneys' fees and costs of litigation) or amounts, of any kind or character (except punitive or exemplary damages), whether under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties, breach of representation or warranty (expressed or implied), under any theory of tort, contract, breach of contract (including any Losses which arise by reason of indemnification or assumption of liability contained in other contracts entered into by Gatherer or Shipper) arising out of, or incident to or in connection with the Agreement or the performance of work, services or operations contemplated under the Agreement.

"Lost and Unaccounted for Gas" or "L&U" means that volume of Gas, in MMBtu, received by Gatherer which is released and/or lost through piping, equipment, or operations, which cannot be accounted for, or is vented, all on the Gathering System.

"MAOP" means maximum allowable operating pressure.

"Mcf" means one thousand (1,000) cubic feet of Gas measured at a base temperature of sixty degrees Fahrenheit (60°F), and at a pressure base of fourteen and seventy-three one-hundredths (14.73) pounds per square inch absolute.

"MMBtu" shall mean one million (1,000,000) Btu.

"Month" means a period beginning at 9:00 a.m. CCT on the first Day of the calendar Month and ending at 9:00 a.m. CCT on the first Day of the next succeeding calendar month.

"New Taxes" means (i) any Taxes enacted and effective after the Effective Date, including that portion of any Taxes or New Taxes that constitutes an increase, or (ii) any Laws, or interpretations thereof, enacted and effective after the Effective Date resulting in the application of any Taxes to a new or different class of parties.

"NGL" or "Natural Gas Liquids" means the demethanized mix of liquefiable hydrocarbons and nonhydrocarbon substances that are condensed or absorbed from, or separated out of natural gas, including ethane, propane, isobutane, normal butane, natural gasoline (pentanes and heavier hydrocarbons) and only those limited quantities of methane and carbon dioxide incidentally recovered with the hydrocarbons. References to Plant Products in this Agreement shall be considered references to Natural Gas Liquids.

"Non-Specification Gas" shall have the meaning set forth in Section 7.3.

"Party" means, individually, either Gatherer or Shipper, collectively referred to as the "Parties".

"Person" or "Persons" means any individual or entity, including, without limitation, any corporation, limited liability company, joint stock company, general or limited partnership, or government authority (including any agency or administrative group thereof).

"Plant" means the turbo-expander, cryogenic Gas processing facilities identified in the applicable ITC, from time to time utilized by Gatherer or Gatherer's nominee for the purpose of processing Gas delivered from the Gathering System, whether such facilities consist of one (1) or more turbo-expander, cryogenic Gas processing facilities, or portions thereof, and recovering a raw unfractionated liquid hydrocarbon mix.

"Plant Products" is defined in Section 5.2, sub-paragraph 2.

"Plant Product Shrinkage" is defined in Section 5.2, sub-paragraph 5.

"Plant Thermal Reduction" or "PTR" means the sum of the Plant Product Shrinkage and allocated process fuel and losses, in MMBtu.

"Primary Term" has the meaning set forth in Section 17.1.

"Psia" means pounds per square inch absolute.

"Psig" means pounds per square inch gauge.

"Quality Specifications" means the Gas quality specifications set forth in Section 7.1.

"Receipt Point(s)" means the point(s) identified in the applicable ITC at which Shipper is to deliver, and Gatherer is to receive, Gas into the Gathering System.

"Residue Gas" is defined in Section 5.2, sub-paragraph 6.

"Retention Volume" means the quantity of Gas, if any, stated in MMBtus that is retained by Gatherer without compensation to Shipper.

"Shipper's Daily Deliverability of Gas" means the Gas which is physically produced by Shipper from wells completed within the Committed Reserves, subject only to Shipper's Reservations.

"Shipper's Interest" means all interests that Shipper (or any of its Affiliates) now or hereinafter owns, controls, acquires, or has the right to market in gas, oil and/or other hydrocarbon reserves in under or attributable to the Subject Leases in the Area of Dedication, together with any pool, communitized area or unit, and all interests in any wells, whether now existing or drilled hereafter, on or completed within any such Subject Leases, or within any such pool, communitized area or unit, even though Shipper's Interest may be incorrectly or

6

incompletely stated, all as the same shall be enlarged by the discharge of any burdens or by the removal of any charges or encumbrances to which any of same may be subject as of the Effective Date, and any and all replacements, renewals and extensions or amendments of any of the same.

"Shipper's Reserved Capacity" or "SRC" means the portion of the aggregate daily gathering and processing capacity reserved for Shipper for Firm Service in the Gathering System and the Plant.

"Stated Rate" means, for any date, an annual rate of interest (compounded daily) equal to the lesser of (a) two percent (2%) over the per annum rate of interest announced as the "prime rate" for commercial loans posted from time to time by Citibank, N.A. (New York, New York office) or its successor or a mutually agreed substitute bank, or (b) the maximum lawful interest rate then in effect under applicable law.

"Subject Leases" means all leaseholds, royalties, overriding royalties, other non-expense bearing accounts, carried interests, fee interests or other real property interests located within the Area of Dedication.

"Taxes" means, to the extent assessed against the Gathering System or the services provided by Gatherer hereunder, any or all ad valorem, property, severance, production, extraction, first use, conservation, Btu or energy, gathering, transport, pipeline, processing, utility, gross receipts, Gas or oil revenue, Gas, NGL or oil import, privilege, sales, use, consumption, excise, lease, transaction, and other or new taxes, governmental charges, licenses, fees, permits, and assessments, or increases therein, other than taxes based on or assessed against net income or net worth.

"Temporary Release Period" has the meaning set forth in Section 16.6.

"Theoretical Gallons" is defined in Section 5.2, sub-paragraph 4.

"Thermal Content" means the product of a volume of Gas and the Gross Heating Value of such Gas, adjusted to a same pressure base of 14.73 p.s.i.a., and expressed in dekatherm or MMBtu.

"Transaction" means any agreement (including that set forth in an Individual Transaction Confirmation) and any amendment, modification, or supplement thereof made subject to and in accordance herewith for the gathering and processing of Gas or provision of other services to be performed hereunder.

1.2    Other Defined Terms.  Other capitalized terms used in this Agreement and not defined in Section 1.1 above shall have the meanings ascribed to them throughout this Agreement.

## ARTICLE II
## SCOPE OF AGREEMENT/TENDER OF GAS

2.1    Scope of Agreement.    Gatherer and Shipper from time to time during the term hereof may, but are not obligated to, enter into Transactions for the gathering and processing of Gas to which this Agreement shall apply.    Each Transaction shall be effectuated and evidenced as set forth in this Article 2 and shall constitute a part of this Agreement and all Transactions, together with this Agreement, shall constitute a single integrated agreement.    Each Transaction shall be construed as one with this Agreement, and any express and irreconcilable conflict between any term contained in this Agreement and any term contained in an Individual Transaction Confirmation shall be resolved in favor of the Individual Transaction Confirmation.

2.2    Tender of Committed Reserves and Gathering Services.    In accordance with Article IV, Shipper shall tender to Gatherer at the Receipt Point(s) one hundred percent (100%) of Shipper's Daily Deliverability of Gas during the term of this Agreement.    Gatherer shall accept at the Receipt Point(s) all Gas that Shipper delivers to such Receipt Point(s) up to the SRC, and shall redeliver all such Gas (less FL&U and PTR) at the Delivery Point(s).    Shipper agrees to comply with Gatherer's (or its Affiliates') scheduling procedures set forth in Section 6.4 hereof.    In addition, Gatherer shall accept at the Receipt Point(s) quantities of Gas above the SRC on an Interruptible basis.

2.3    Facilities.    Except as set forth in an Individual Transaction Confirmation, Gatherer shall not be obligated to add to or modify its facilities or expand the capacity of the Gathering System or Plant in any manner in order to provide services to Shipper, including, but not limited to providing conditioning, treating, dehydration, compression, processing, or other services or associated facilities in order to receive Gas at an existing or new Receipt Point(s). Shipper may request, in writing, that Gatherer expand facilities or add new Receipt Point(s) or Delivery Point(s) or provide additional services.    Gatherer shall determine, in its sole discretion, whether it will construct the facilities necessary to provide such requested services.    In the event Gatherer agrees to provide such services, then Gatherer shall have the right to re-determine the fees to be charged hereunder and/or to establish the fees for such additional services; provided that any such fees shall be mutually agreed upon by Gatherer and Shipper prior to going into effect.    Shipper shall install and operate or cause the installation and operation of all facilities necessary to deliver Shipper's Gas to Gatherer at the Receipt Point(s).

2.4    Allocations.    Shipper recognizes that quantities of Gas are delivered through the Delivery Point(s) for third parties, and therefore, the scheduling of Gas under this Agreement may involve the allocation of Gas deliveries.    As between Gatherer and Shipper, Gatherer will determine the allocation for all Gas deliveries hereunder.

8

# ARTICLE III
## GATHERING AND PROCESSING FEES

3.1     Gathering and Processing Fee(s).   The gathering and processing fee(s) to be paid by Shipper to Gatherer for the quantities of Gas delivered by Shipper and received, gathered and processed by Gatherer hereunder shall be as set forth on the Individual Transaction Confirmation (the "Gathering and Processing Fee(s)").

3.2     FL&U.  In addition to the Gathering and Processing Fees, Shipper shall convey to Gatherer at the Receipt Point(s) Shipper's pro rata share of FL&U.  Title to the FL&U shall vest in Gatherer at the Receipt Point(s) at no cost to Gatherer.

# ARTICLE IV
## DEDICATION

4.1     Dedication of Committed Reserves.   For the term of any applicable Individual Transaction Confirmation, and subject to the provisions hereof, Shipper hereby exclusively dedicates and commits to Gatherer for gathering and/or other services hereunder (or shall cause to be dedicated and committed to Gatherer for gathering and/or other services hereunder) as a covenant running with the land, all of the Committed Reserves.   During the term of this Agreement, Shipper agrees not to disconnect or split-connect any wells from Gatherer's HPGP. Notwithstanding anything to the contrary, unless such dedication is otherwise waived or released in writing by Gatherer hereunder, any attempted assignment or transfer (in whole or in part, including any farmout agreement or other similar or related arrangement) of any or all of the Committed Reserves or rights thereto shall constitute a Default by Shipper hereunder and be null and void unless such assignment or transfer includes an express provision stating that (a) such assignment or transfer is made subject to the terms of this commitment and this Agreement, and (b) the assignee or transferee agrees to become a party to, and bound by, the terms and conditions set forth in this Agreement, such that all of the Committed Reserves remain dedicated to this Agreement for the term hereof.   Shipper does hereby grant, bargain, sell, convey, transfer, assign and deliver unto Gatherer such real property interest in the Subject Leases necessary to create a covenant running with the land, including without limitation the rights of ingress and egress on and over the Subject Leases, and the dedication of Committed Reserves provided for herein shall be a covenant running with the land and burdening the Subject Leases.

4.2     Shipper's Reservations.   Shipper hereby expressly reserves the following rights and reasonable quantities of Gas to satisfy same ("Shipper's Reservations"):

(a)     The right to use Gas, as a reasonably prudent operator, prior to delivery to Gatherer for the following purposes:

(1)     For fuel used above ground in the development and operation of the Committed Reserves; and

9

(2)    For delivery to the "lessor" from whom the Subject Leases were obtained that Gas which such lessors are entitled to receive in kind from the Committed Reserves under the terms of the Subject Leases; and

(3)    For fuel used in the operation of the facilities which Shipper may install in order to deliver Gas hereunder in accordance with the terms hereof.

(4)    The right to engage in swaps and trades of undeveloped acreage but only with prior written consent of Gatherer, which shall not be unreasonably conditioned, delayed or withheld.

(b)    The right to pool or unitize the Subject Leases (or any portion thereof) with other lands and leases. In the event of pooling or unitization, this Agreement will cover Shipper's interest in the pool or unit and the Gas attributable thereto.

(c)    The right to separate the Gas using only mechanical, ambient temperature equipment located at surface production facilities on the Subject Leases.

### ARTICLE V
### PROCESSING

5.1    Shipper does hereby grant, assign and convey to Gatherer all of its rights to process or cause to be processed for the removal and recovery of all components other than methane, all of the Gas received at the Receipt Point(s).

5.2    For all purposes, unless the context of this Agreement requires otherwise, the following definitions shall be applicable:

(1)    "Inlet Volume" shall mean the volume in Mcf of Gas received at a particular Receipt Point less Fuel and L&U, in Mcf.

(2)    "Plant Products" shall mean the unfractionated liquid hydrocarbon mix consisting of (i) ethane, (ii) propane, (iii) iso-butane, (iv) normal butane, and (v) pentanes plus; adsorbed, absorbed or condensed in the Plant from Gas delivered to Gatherer.

(3)    "Component Plant Products" shall mean (i) ethane, (ii) propane, (iii) iso-butane, (iv) normal butane, and (v) pentanes plus (including iso-pentane, normal pentane and hydrocarbon components of higher molecular weight) for the purposes of settlement and allocation hereunder.

(4)    "Theoretical Gallons" of a particular Component Plant Product shall mean the result obtained by multiplying the particular Component Plant Product content of a particular Gas stream (expressed in gallons per Mcf) by the Inlet Volume (in Mcf) of that particular stream delivered for processing (the result being expressed in gallons).

(5)    "Plant Product Shrinkage" shall mean the heating value equivalent of the Component Plant Products.

10

(6)    "Residue Gas" shall mean that portion of Inlet Volume remaining after deducting Condensate, Plant Product Shrinkage, and allocated process fuel and losses (including electricity cost).  Process fuel and losses will be calculated as the difference between the Plant inlet quantities and all outlet quantities.  The Plant outlet quantities, which shall include all Plant fuel, shall equal the total of all quantities (in MMBtu) of Gas exiting the Plant plus the heating value equivalent (in MMBtu) of all Plant Products actually recovered in the Plant.  The Plant inlet quantities shall equal the total of all quantities (in MMBtus) of Gas entering the Plant at the Plant inlet meter.  Shipper's allocated process fuel and losses (including electricity cost) shall be based on a percentage, the numerator of which is the Inlet Volume and the denominator of which is the total Plant inlet quantities, in MMBtu.





## ARTICLE VI
## QUANTITY

6.1    During the term of this Agreement, Gatherer shall have the right to take and receive one hundred percent (100%) of Shipper's Daily Deliverability of Gas.

6.2    Gatherer agrees to take and Shipper agrees to deliver Gas hereunder in accordance with all applicable Laws including, but not limited to, the rules promulgated by any duly constituted state or federal governmental authority, regulatory body or commission having jurisdiction or control over the Parties, its respective facilities or Gas supply, this Agreement, the gathering or processing of Gas hereunder, or any of the provisions hereof (the "Commission") governing the determination of Gas market demand and procedures for the establishment and allocation of allowables and for ratable nominations and takes of Gas from the applicable field(s). The Parties expressly recognize that Gatherer's obligations to take Gas pursuant to the Commission rules or otherwise shall be subject to Force Majeure.

6.3    Subject to the terms, conditions and limitations contained herein and in the ITC, Shipper agrees to deliver, or cause to be delivered, to the Receipt Point(s), and Gatherer agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of Shipper's Gas as set forth in any Individual Transaction Confirmation, and scheduled in accordance with this Section 6. However, except as otherwise provided herein, in no event shall Shipper tender volumes of Gas for gathering and/or processing services hereunder on any Day in excess of the Scheduled Quantity (defined in Section 6.4). Subject to the terms, conditions and limitations contained herein, Shipper agrees to accept, or cause to be accepted, at the Delivery Point(s), and Gatherer agrees to gather, process and redeliver, or cause to be gathered, processed and redelivered, on a Firm basis the Scheduled Quantity. The Scheduled Quantity at the Delivery Point(s) shall be a quantity of Gas equal to the remainder of the Scheduled Quantity at the Receipt Point(s) less Shipper's pro rata share of FL&U and PTR. The maximum quantity of Gas that Gatherer is obligated to receive hereunder at the Receipt Point(s) and deliver hereunder at the Delivery Point(s) during any given hour of any Day is 1/24 of Shipper's Scheduled Quantity at an instantaneous standard volumetric flow rate at any point in time during the hour. Any variation in flow rate or the Scheduled Quantity will be confirmed in writing via fax or email by Gatherer, with an acknowledgment returned to Gatherer by Shipper.

6.4    Scheduling of receipts and deliveries of Gas between the Receipt Point(s) and Delivery Point(s) shall be in accordance with the Gatherer's nomination and scheduling procedures and with the nomination and scheduling procedures of the Downstream Transporter. Shipper shall submit Nominations (as defined below) for the gathering of Gas hereunder to Gatherer via Gatherer's Web-based online nomination system. No later than three (3) Business Days prior to the end of each Month, Shipper shall provide to Gatherer in writing the quantity of Gas (expressed in MMBtu) Shipper expects to make available and deliver at each Receipt Point and receive at the Delivery Point(s) each Day of the following Month (the "Nominations"). Should Shipper desire to change any of the Nominations during such Month, Shipper will use reasonable efforts to notify Gatherer by no later than 8:30 a.m. CCT on the Business Day prior to the Day of the scheduled flow of the capacity and path that the Shipper plans to utilize. The

13

deadline for submitting Nominations is 11:30 a.m. CCT the Business Day prior to the Day of the scheduled flow. Any initial Nomination received after the deadline of 11:30 a.m. CCT on the Business Day prior to the flow Day will be scheduled by Gatherer in its discretion. Gatherer may, in its discretion, allow intraday Nomination changes at the Receipt Point(s) and the Delivery Point(s). Gas shall be delivered by Gatherer to the Delivery Point(s) in accordance with confirmation by the Downstream Transporter of the Nomination and/or changes to the Nomination (the "Scheduled Quantity").

6.5     Any variance between the volume of Gas delivered at the Delivery Point(s) for Shipper's account and the volume of Gas received at the Receipt Point(s) (less any FL&U and PTR) the "Imbalance" will be recorded in a Gas Imbalance Account. If the absolute volume in the Gas Imbalance Account is greater than a plus or minus MMBtu tolerance specified in any Individual Transaction Confirmation ("Cumulative Operational Imbalance Tolerance"), then, at Gatherer's election, Shipper shall pay Gatherer an amount equal to a dollar value specified in each Individual Transaction Confirmation multiplied by the quantity in the Gas Imbalance Account exceeding the Cumulative Operational Imbalance Tolerance for each Month such event occurs, ("Cumulative Operational Imbalance Fee"). Any physical flow adjustments will be made as agreed to by Gatherer (which shall be confirmed in writing via fax or email by Gatherer, with an acknowledgment to be returned to Gatherer by Shipper) to adequately control imbalance levels. The daily and cumulative Imbalance(s) will be determined at the end of each Gas Day. Gatherer may assist Shipper in managing the Imbalance and may, at any time and from time to time, request that Shipper change its Nominations at the Delivery Point(s) or, with notice to Shipper, restrict, interrupt, or reduce its receipts or deliveries of Gas at the Receipt Point(s) or Delivery Point(s), and direct Shipper to make adjustments in its receipts or deliveries, in order to maintain a daily, hourly and monthly balance or to correct an Imbalance. If Shipper fails or refuses to follow any such request from Gatherer, Gatherer may, without liability hereunder, cease accepting or delivering Gas under this Agreement until the conditions causing the Imbalance are corrected. Notwithstanding the foregoing, in the event that Gatherer is assessed a cash out penalty by the Downstream Transporter, which is attributable to Shipper, Shipper shall reimburse Gatherer for the actual amount of such cash out penalty.

6.6     It is recognized that in order for Gatherer to efficiently and safely operate its Gathering System and Plant, it is essential that Gas received into the Gathering System be made available to Gatherer under as uniform operating conditions as possible. Commensurate with good production and operating practices, and in accordance with proper conservation measures, Shipper agrees to deliver Gas, or cause it to be delivered, to Gatherer at such rates of flow as Gatherer, in the sole exercise of its reasonable judgment, may from time to time request. Gatherer agrees to give Shipper reasonable notice in the event Gatherer desires at any time to increase or decrease the quantity of Gas tendered by Shipper at any Receipt Point. For safety reasons, or to maintain the operational integrity of the Gathering System or Plant, Gatherer may, at any time, with reasonable notice to Shipper, interrupt or reduce, in whole or in part, its receipt, gathering of Gas and/or the provision of processing or other services hereunder or delivery of Shipper's Gas, all without incurring any liability of any kind to Shipper or to others.

14



**ARTICLE VII**
**QUALITY**





16



## ARTICLE VIII
## MEASUREMENT





18



19



## ARTICLE IX
## BILLING

9.1  <u>Gatherer's Statement.</u>  Gatherer shall render a statement to Shipper on or about the twenty-fifth (25th) Day of each Month setting forth (a) the amount due Gatherer for all Gathering and Processing Fees incurred by Shipper for the services performed hereunder by Gatherer during the preceding Month, (b) the settlement quantity of Residue Gas returned to Shipper for that statement period, and (c) the dollar amount of the Plant Products purchased from Shipper for that statement period (the "<u>Plant Product Value</u>").  Such statement shall contain reasonably detailed information showing the determination of such Residue Gas and such Plant Product Value.  The Parties agree that the Gathering and Processing Fees owed by Shipper to Gatherer hereunder for such Month may be deducted from the Plant Product Value owed to Shipper for such Month.  Gatherer shall (x) include with such statement an invoice for the difference between the total dollar amount of the Gathering and Processing Fees and the Plant Product Value if such Fees are greater than the Plant Product Value; or (y) if the Plant Product Value is greater than such Fees, Gatherer shall pay Shipper the difference by wire transfer on or before the tenth (10th) Day following the rendition of the statement.  If actual Gas or Plant Product quantities are not available, Gatherer may utilize a reasonable, good faith, estimated quantity based upon quantities received, gathered or extracted by Gatherer during the preceding Month.  As soon as the actual quantity becomes available, the estimate shall be adjusted and the adjustment shall be reflected in the subsequent Month's statement.  In the event such quantities are estimated for any period, corrected statements shall be rendered by Gatherer to Shipper and paid by Shipper or refunded or credited by Gatherer, as the case may be, in each instance in which the actual quantity received or delivered hereunder with respect to a Month shall be determined to be at variance with the estimated quantity theretofore made the basis of billing and payment hereunder.

9.2  <u>Payment.</u>  If the Gathering and Processing Fees on any statement are greater than the Plant Product Value on such statement, then Shipper shall pay Gatherer the amount due in the form of immediately available federal funds by wire or electronic fund transfer to the bank account specified on the statement, or any other mutually agreed upon method, on or before the tenth (10th) Day following the rendition of the statement described in Section 9.1 hereof.  Payments by either Party due on a Saturday or a bank holiday shall be made on the preceding Business Day unless such holiday is Monday, in which case payment shall be made on the following Business Day; payments due on Sunday shall be made on the next Business Day. The paying Party must tender a timely payment even if the statement includes an estimated receipt or delivery volume. Any payment shall not prejudice the right of the paying Party to an adjustment of any statement to which it has taken written exception, provided that such Party's exception

20

shall have been made within the time period set forth in Section 19.15 herein. If the paying Party fails to pay any statement in whole or in part when due, in addition to any other rights or remedies available to the Party to whom payment is due, interest at the Stated Rate shall accrue on all unpaid amounts. Notwithstanding the foregoing, if a legitimate good faith dispute arises between Shipper and Gatherer concerning a statement, the paying Party shall pay that portion of the statement not in dispute on or before such due date, and upon the ultimate determination of the disputed portion of the statement, the paying Party shall pay the remaining amount owed, if any, plus the interest accrued thereon at the Stated Rate from the due date. Any amounts refunded to a paying Party following resolution of any billing dispute shall accrue interest at the Stated Rate from the date of initial payment to the date of refund.

## ARTICLE X
## WARRANTY

10.1    Shipper's Warranty.  Shipper hereby represents and warrants that it has good and marketable title to, and full legal right and authority to deliver to Gatherer for gathering and processing hereunder, all Gas tendered by Shipper at the Receipt Point(s).  Shipper represents and warrants that such Gas shall, at the Receipt Point(s), be free and clear of any and all claims, royalties, liens, encumbrances, and applicable Taxes that are imposed upon production of such Gas and all other components of such Gas and/or upon removal of liquid hydrocarbons, and **SHIPPER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS** Gatherer from and against all Losses incurred by Gatherer on account of any such liens, encumbrances and claims.

10.2    Gatherer's Warranty.  Gatherer hereby represents and warrants that it has the full legal right and authority to gather and process for Shipper, all Gas tendered by Shipper at the Receipt Point(s) pursuant to this Agreement.  Gatherer represents and warrants that such Gas from the time of receipt at the Receipt Point(s) to the time of delivery at the Delivery Point(s) shall be free and clear of all liens, encumbrances and claims whatsoever, and **GATHERER AGREES TO RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS** Shipper from and against all Losses incurred by Shipper on account of any such liens, encumbrances and claims.

## ARTICLE XI
## POSSESSION OF GAS

11.1    Party in Possession.  As between Parties hereto, Shipper shall control and possess the Gas affected by this Agreement at all times prior to and until delivery to Gatherer at the Receipt Point(s) and after redelivery by Gatherer to Shipper at the Delivery Point(s).  Gatherer shall control and possess the Gas affected by this Agreement at all times after delivery thereof by Shipper to Gatherer at the Receipt Point(s) and until redelivery by Gatherer to Shipper at the Delivery Point(s).

21

11.2   <u>Responsibility and Liability</u>. Except as otherwise set forth herein, the Party in control and possession of the Gas affected by this Agreement shall be responsible and pay for any and all Losses caused thereby and occurring while the Gas is in the possession and control of such Party.

## ARTICLE XII
## TAXES AND ROYALTIES

12.1   <u>Shipper Taxes and Royalties</u>. Shipper shall be responsible for all applicable Taxes, New Taxes and royalties of whatever kind on or with respect to the production, delivery and gathering or processing of Gas hereunder. Shipper shall indemnify, reimburse, defend and hold harmless Gatherer from and against any and all claims or Losses attributable to such Taxes, New Taxes and royalties.

## ARTICLE XIII
## REMEDIES/LIABILITY

13.1   <u>Remedies</u>. To the extent not limited or waived herein, with particularity in this Article XIII, each Party reserves to itself all rights, set-offs, counterclaims and other remedies and defenses to which such Party may be entitled arising from this Agreement. All payment obligations hereunder may be offset against each other or recouped.

13.2   <u>LIMITATION OF LIABILITY</u>. FOR BREACH OF ANY PROVISION FOR WHICH EXPRESS, SPECIFIC REMEDIES OR MEASURES OF DAMAGES ARE PROVIDED, SUCH REMEDIES OR DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDIES, THE OBLIGOR'S LIABILITY SHALL BE SO LIMITED, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED, INCLUDING THOSE ATTRIBUTABLE TO THE SOLE, JOINT OR CONCURRENT NEGLIGENCE OF OBLIGOR AND IRRESPECTIVE WHETHER THE CLAIM IS BASED ON CONTRACT, TORT, EQUITY OR OTHERWISE. IF NO REMEDY OR MEASURE OF DAMAGES IS PROVIDED AND UNLESS OTHERWISE HEREIN STATED, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES, SUCH DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES IN LAW OR EQUITY ARE WAIVED. UNLESS OTHERWISE STATED HEREIN, NEITHER PARTY SHALL BE LIABLE FOR TREBLE, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, IN TORT, CONTRACT, UNDER ANY INDEMNITY OR OTHERWISE. THE PARTIES NEGATE ANY OBLIGATION, EXPRESSED OR IMPLIED AT LAW, REQUIRING THE USE OF BEST EFFORTS TO SUPPLY, DELIVER, TAKE OR MARKET THE GAS.

## ARTICLE XIV
## CREDIT ASSURANCE

14.1   All requirements to provide any "<u>Adequate Assurance of Performance</u>" shall be limited to that provided in an applicable ITC.

22

## ARTICLE XV
### NOTICES

15.1 <u>Notices</u>. Any notice, request, demand, or statement provided for in this Agreement, or any notice which a Party may desire to give to the other, shall be in writing, and shall be delivered by letter, facsimile or other documentary form. Notice by facsimile or hand delivery shall be deemed to have been received by the close of the Business Day on which it is transmitted or hand delivered (unless transmitted or hand delivered after close, in which case it shall be deemed received at the close of the next Business Day) or such earlier time confirmed by the receiving Party:

Gatherer:

**For Remittance:**
**By Wire Transfer:**
**La Grange Acquisition, L.P., for further credit to**
**ETC Northeast Pipeline, LLC**
Wells Fargo Bank N.A.
Acct. 2079900565328
Wire ABA # 121000248
ACH ABA # 053101561

**For Notices and Correspondence:**
**ETC Northeast Pipeline, LLC**
**Contract Administration**
800 East Sonterra Blvd. Ste 300
San Antonio, Texas 78258
Telephone (210)403-7300
FAX (210)403-7500

**For Accounting Matters:**
**ETC Northeast Pipeline, LLC**
800 East Sonterra Blvd. Ste 400
San Antonio, Texas 78258

Shipper:

**For Notices and Scheduling:**
**EM Energy Pennsylvania, LLC**
Attn: Director, Production Operations
1800 Main Street, STE 220
Canonsburg, PA 15317
Telephone: 412-564-1000

23

For Invoices and Statements:

**EM Energy Pennsylvania, LLC**
Attn: Accounting Department
1800 Main Street, STE 220
Canonsburg, PA 15317
Telephone: 412-564-1000

Such addresses and/or other contact information may from time to time be changed by sending appropriate notice thereof to the other Party in any manner provided in this Section 15.1.

## ARTICLE XVI
## FORCE MAJEURE

16.1    Suspension of Obligations.    Unless expressly provided otherwise in this Agreement, no Party shall be liable to any other Party for failure to perform any of its obligations under this Agreement, other than to make payments due, to the extent that and for the period during which such performance is hindered, delayed or prevented by Force Majeure.  For purposes of this Agreement, "Force Majeure" shall mean causes, conditions, events or circumstances which are beyond the reasonable control of the Party claiming Force Majeure. Such causes, conditions, events and circumstances shall include, without limitation, to the extent beyond the reasonable control of the Party claiming Force Majeure, acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, acts of nature, industrial disturbances, acts of the public enemy, acts of terrorism, sabotage, blockades, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, or blockages of lines of pipe not due to lack of maintenance, extraordinary operating conditions on Gatherer's, Shipper's or Shipper's facilities or on those of any Downstream Transporter or NGL pipeline, Force Majeure events on any Downstream Transporter or NGL pipeline, inability of any Party to obtain necessary machinery, materials, permits, refusal of one or more landowners to provide necessary easements or rights-of-way, freezing of any well or delivery facility, well blowout, cratering, the partial or entire failure of a well and the act, order, rule or regulation of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement, and any other causes whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension. Force Majeure does not include: mechanical failure or breakdown of electric generation plants, changes in market conditions or changes in demand for electricity at electric generation plants such as increases or decreases in electric generation that are required by any agency or body having such authority, or failure of upstream transportation prior to delivery hereunder at the Receipt Point(s).  Notwithstanding anything herein to the contrary, no Party shall be entitled to the benefits of this Section 16.1 to the extent the event of Force Majeure is caused or affected by any or all of the following circumstances: (i) the Party claiming excuse failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch; or (ii) economic hardship,

24

to include, without limitation, Shipper's ability to sell its Gas at a higher or more advantageous price to a market not requiring the gathering or processing services contracted for herein.

16.2    Notice.  A Party which is unable, in whole or in part, to carry out its obligations under this Agreement due to Force Majeure shall give prompt written notice to that effect to the other Parties stating with reasonable particularity the circumstances underlying such Force Majeure and the obligations such Party is unable to carry out.

16.3    Resolution.  A Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure, shall give prompt written notice to the other Parties of the termination of such Force Majeure, and shall resume performance of any suspended obligation promptly after termination of such Force Majeure.  The decision to settle a strike or labor disturbance is at the sole discretion of the Party claiming Force Majeure due to such strike or labor disturbance.

16.4    Repairs and Maintenance.  Gatherer shall not be liable to Shipper for interruptions or curtailment of Shipper's Gas on the Gathering System or at the Plant as a result of maintenance, integrity testing, repairs or improvements to pipelines or other facilities.  Gatherer shall provide Shipper with notice of such interruptions or curtailments as far in advance as practicable, and shall use commercially reasonable efforts to limit the duration of same.



### ARTICLE XVII
### TERM AND TERMINATION

17.1    Effective Date and Term.  This Agreement shall govern any and all Transactions and shall be in effect for a term of twenty (20) year(s) from April 17, 2015 (the "Primary Term"). It shall then continue in effect from Month to Month thereafter (each such Month, the "Extended Term"), unless terminated by either Shipper or Gatherer upon thirty (30) Days prior written notice to the other Party prior to the end of the Primary Term or any Extended Term, as the case may be; *provided* that this Agreement shall continue to apply to all Transactions then in effect until all Transactions are completed.

17.2    Termination.  This Agreement may be terminated or canceled as follows and in no other manner:

(a)     By either Gatherer or Shipper, in the event of any uncured Default of the other Party, *provided* that the terminating Party is not itself in Default (other than a Default which occurs because such Party is rightfully withholding performance in response to the other Party's Default);

(b)     By the applicable Party pursuant to any provision of this Agreement expressly providing termination rights; or

(c)     By all of the Parties at any time upon mutual written agreement.

17.3     <u>Rights and Obligations Upon Termination</u>.  Termination or cancellation of this Agreement shall not relieve the Parties from any obligation accruing or accrued prior to the date of such termination.  Upon termination of this Agreement, the Parties shall retain all other rights and remedies available at law or in equity.

## ARTICLE XVIII
## REPRESENTATIONS AND WARRANTIES

18.1     <u>Representations and Warranties</u>.  Each of Shipper and Gatherer represents and warrants to each other that on and as of the date hereof:

(a)     It is duly formed, validly existing and in good standing under the laws of its state of jurisdiction or formation, with power and authority to carry on the business in which it is engaged and to perform its respective obligations under this Agreement;

(b)     The execution and delivery of this Agreement by it have been duly authorized and approved by all requisite corporate, limited liability company, partnership or similar action;

(c)     It has all the requisite corporate, limited liability company, partnership or similar power and authority to enter into this Agreement and perform its obligations hereunder;

(d)     The execution and delivery of this Agreement does not, and consummation of the transactions contemplated herein will not, violate any of the provisions of organizational documents, any agreements pursuant to which it or its property is bound or, to its knowledge, any applicable Laws;

(e)     This Agreement is valid, binding and enforceable against it in accordance with its terms subject to bankruptcy, moratorium, insolvency and other Laws generally affecting creditors' rights and general principles of equity (whether applied in a proceeding in a court of law or equity); and

(f)     It is qualified to do business in the State(s) in which the Subject Leases, Receipt Point(s) and Delivery Point(s) are located.

26

## ARTICLE XIX
## MISCELLANEOUS

19.1   <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between and among the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous (oral or written) negotiations, proposals, agreements and understandings.

19.2   <u>Modifications</u>.  No modifications of the terms and provisions of this Agreement shall be or become effective except by the execution by each of the Parties of a supplementary written agreement.

19.3   <u>Waiver</u>.  No waiver by any Party of any one or more Defaults by the other Party in performance of any provisions of this Agreement shall operate or be construed as a waiver of any future Default or Defaults, whether of a like or a different character.

19.4   <u>No Third Party Beneficiaries</u>.  This Agreement is for the sole and exclusive benefit of the Parties hereto.  Except as expressly provided herein to the contrary, nothing herein is intended to benefit any other Person not a Party hereto, and no such Person shall have any legal or equitable right, remedy or claim under this Agreement.

19.5   <u>Assignment</u>.  Except as otherwise set forth herein, this Agreement is binding upon the successors or assigns of Gatherer and Shipper.  Neither Party shall voluntarily or involuntarily, directly or indirectly, transfer or otherwise alienate any or all of its rights, title or interests under this Agreement to any other Person without the express prior written consent of the other Party, which consent shall not be unreasonably delayed or withheld; *provided, however*, that a Party may (without seeking the consent of the other Party) transfer or otherwise alienate any of its rights, title or interests under this Agreement in connection with (i) a transfer to an Affiliate which remains an Affiliate, and (ii) the granting of a pledge, mortgage, hypothecation, lien or other security interest and any transfer pursuant to or in settlement of any terms of provisions of any agreement creating any such security interest.  Unless otherwise agreed to in writing by the other Party, and except for transfers pursuant to (ii) above, both the transferor and the transferee shall be jointly and severally responsible and primarily liable for the full and timely performance of all covenants, agreements and other obligations, and the timely payment and discharge of all liabilities, costs and other expenses arising (directly or indirectly) pursuant to this Agreement.  Promptly upon transfer of all or any portion of its rights, title and interests in and to this Agreement, the transferor shall provide the other Party with a copy of such instrument.  Any attempted transfer in violation of the terms of this Agreement of any rights, title and interests arising under this Agreement shall constitute a Default and be null and void and have no force or effect.

19.6   <u>Confidentiality</u>.  The Parties agree that all information and data exchanged by them pursuant to or in connection with this Agreement shall be maintained in strict and absolute confidence for the term of this Agreement and one (1) year following its termination or cancellation except for disclosure (a) pursuant to the permitted sale, disposition or other transfer

27

(directly or indirectly) of a Party's rights and interests in and to this Agreement, (b) to lenders, accountants and other representatives of the disclosing Party with a need to know such information, (c) in conjunction with a merger, consolidation, share exchange or other form of statutory reorganization involving a Party, (d) as required to make disclosure in compliance with any applicable Law or (e) to a Party's officers, directors and personnel, as necessary to carry out such Party's obligations under the Agreement.

19.7  Exhibits and Schedules.  All exhibits, schedules and the like contained herein or attached hereto are integrally related to this Agreement and are hereby made a part of this Agreement for all purposes.  Except as otherwise provided in Section 2.1 hereof, to the extent of any ambiguity, inconsistency or conflict between the body of this Agreement and any of the exhibits, schedules and the like attached hereto, the terms of the body of this Agreement shall prevail.

19.8  Choice of Law.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

19.9  Further Assurances.  Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use all reasonable efforts to take, or cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.  In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purpose, the proper officers or directors of the Parties shall take or cause to be taken all such necessary actions.

19.10  Survival.  The provisions of this Agreement shall survive any expiration or termination thereof for so long as necessary to give effect to the intent of the Parties, but in no event to exceed any applicable statute of limitations.

19.11  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective as to such jurisdiction, to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any terms and provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, each provision shall be interpreted to be only as broad as is enforceable.

19.12  Terminology.  Unless the context clearly requires otherwise, all personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and vice versa.  Articles, sections and other titles or headings are for convenience only, shall neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof shall refer to the corresponding article, section or subdivision thereof of this Agreement

28

unless specific reference is made to such articles, sections or subdivisions of another document or instrument.

19.13 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, including by electronic transmission, each of which, when so executed, shall be deemed an original, and all of which together shall constitute but one and the same instrument.

19.14 <u>Compliance with Laws</u>. This Agreement and the performance of the obligations contemplated herein are and shall be subject to all valid applicable Laws. The Parties shall act in accordance with each such Law. The Parties will cooperate with respect to compliance with all governmental authorizations, including obtaining and maintaining all necessary regulatory authorizations or any reasonable exchange or provision of information needed for filing or reporting requirements.

19.15 <u>Audit</u>. Each Party shall have the right to examine and audit, at its own expense, at reasonable times during regular business hours and upon reasonable notice, all books, records and charts of the any other Party to the extent necessary to verify the accuracy of any measurement and payment hereunder, and the related statements, computations, allocations and procedures provided for in the Agreement, for a period of two (2) years after the date of the statement in which such measurement, payment, computation, allocation or procedure is reflected; provided, however, that a formal audit of accounts shall not be made more often than every twelve (12) months and will not include any time period for which a prior audit hereunder was conducted. Any inaccuracy will be promptly corrected when discovered, but in no event later than six (6) months after such audit exceptions are received by the audited Party; provided, however, that no Party shall have the right to contest any such measurement or payment, or the related statement, computation, allocation or procedure, if the matter is not called to the attention of the other Party in writing within two (2) years after (a) the date upon which such measurement was conducted or such payment was made, or (b) the date of the related statement, computation, allocation or procedure containing the questioned inaccuracy. Any of such items not contested with specificity in writing within such time period shall conclusively be deemed to be accurate.

19.16 <u>Termination of Original Agreement</u>. The Original Agreement is hereby terminated as of the Effective Date and superseded in its entirety by the terms and conditions of this Agreement.

[signature page next page]

29

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their respective duly authorized representatives effective as of the Effective Date.

| **"GATHERER"** | | **"SHIPPER"** | |
| --- | --- | --- | --- |
| **ETC NORTHEAST PIPELINE, LLC** | | **EM ENERGY PENNSYLVANIA, LLC** | |
| | | | |
| **By:** | | **By:** | |
| **Printed Name:** | | **Printed Name:** | BRIAN H. MCCURDIE |
| **Title:** | | **Title:** | CFO |

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed by their respective duly authorized representatives effective as of the Effective Date.

**"GATHERER"**  
**ETC NORTHEAST PIPELINE, LLC**

**"SHIPPER"**  
**EM ENERGY PENNSYLVANIA, LLC**

By: _____

**Printed Name:** Mackie McCrea

**Title:** Chief Commercial Officer

By: _____

**Printed Name:** _____

**Title:** _____

*Execution Version*

<div align="center">

**AMENDED AND RESTATED**
**INDIVIDUAL TRANSACTION CONFIRMATION**
(Gatherer's Contract No. 9532-101)
**TO**
**AMENDED AND RESTATED**
**GATHERING AND PROCESSING AGREEMENT**
**BETWEEN EM ENERGY PENNSYLVANIA, LLC**
**AND**
**ETC NORTHEAST PIPELINE, LLC**
**DATED NOVEMBER 13, 2017**

</div>

**THIS AMENDED AND RESTATED INDIVIDUAL TRANSACTION CONFIRMATION** (this "ITC") is entered into effective as of the 13th day of November, 2017 ("Effective Date"), by and between ETC Northeast Pipeline, LLC ("Gatherer") and EM Energy Pennsylvania, LLC ("Shipper"). This ITC constitutes part of and is subject to all of the terms and provisions of the Base Agreement (collectively, the "Agreement"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Base Agreement, unless otherwise defined herein. Any discrepancy or conflict between any term contained in the Base Agreement and any term contained in this ITC shall be resolved in favor of this ITC.

<div align="center">

**WITNESSETH:**

</div>

**WHEREAS,** Gatherer and Shipper entered into that certain Individual Transaction Confirmation dated April 17, 2015 (Gatherer's Contract No. 9532-101), as amended pursuant to that First Amendment to Individual Transaction Confirmation dated August 1, 2015 (as so amended, the "Original ITC 101");



**WHEREAS,** in consideration of and in express reliance on, *inter alia*, the making of the Parent Commitment by Parent and the Equity Sponsor Commitment by the Equity Sponsors and Parent, Gatherer has agreed to amend and restate the Original ITC 101; and



**WHEREAS**, Gatherer and Shipper now desire to amend and restate the Original ITC 101, on the terms and conditions set forth herein.

**NOW, THEREFORE**, for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows:

<p align="center">AGREEMENT</p>

**BASE AGREEMENT:** Amended and Restated Gathering and Processing Agreement dated November 13, 2017, Contract No. 9532-100.

**INDIVIDUAL TRANSACTION NUMBER:** 9532-101

**SHIPPER:** EM Energy Pennsylvania, LLC

**GATHERER:** ETC Northeast Pipeline, LLC

**GUARANTEED IN-SERVICE DATE:** January 1, 2019

**TERM:** This ITC shall become effective on the Effective Date, and continue until twenty years from the In-Service Date ("Primary Term") and thereafter continue in effect from Year to Year, until terminated by Shipper or Gatherer giving the other Party written notice no less than ninety days (90) Days prior to the end of the Primary Term or any such annual extension.

**GATHERING SYSTEM:** The Gathering System to be constructed, owned and operated by Gatherer under this ITC is depicted in part on the map shown on Exhibit A hereto, as may be updated by mutual agreement of the Parties, and will be capable of (i) gathering the SRC from the Receipt Points upstream of the Galaxy Central Delivery Point ("Galaxy CDP") for delivery to the Galaxy Compressor Station ("LP-Galaxy Gathering"), (ii) compressing and dehydrating the SRC at the Galaxy Compressor Station ("Galaxy Compression"), (iii) gathering, via Gatherer's high pressure gas pipeline ("HPGP"), the SRC from the Galaxy Compressor Station to the Plant ("HP Gathering") and (iv) gathering Residue Gas from the Plant for delivery to the Delivery Point.





The first Day of the Month following the Day on which the LP-Galaxy Gathering (other than laterals to the Sculptor Receipt Point and the Monoceros Receipt Point), Galaxy Compression, HPGP, HP Gathering, Plant and Delivery Point are completed and placed in commercial service shall be the "In-Service Date" hereunder.





**FAILURE TO MEET GUARANTEED IN-SERVICE DATE:** If the In-Service Date shall not have occurred by the Guaranteed In-Service Date of January 1, 2019, irrespective of any outstanding or intervening declarations of Force Majeure, then Shipper may terminate this ITC upon written notice to Gatherer within thirty (30) Days of the Guaranteed In-Service Date, and neither Party shall have further obligation to the other hereunder.

**PLANT:** The Plant hereunder shall be Gatherer's Revolution I cryogenic processing plant capable of processing the SRC and located in Washington County, PA.

**RECEIPT POINTS:** The Receipt Points for all Gas delivered by Shipper hereunder shall be at the inlet flange of the master meters at the well pad sites, to be constructed and owned by Gatherer, identified in the table below, and each Receipt Point shall have a maximum daily delivery quantity as specified in the table:

5



6

**COMPONENT RECOVERY FACTORS:**









(A)    In conjunction with execution of the Original Agreement, the Original ITC 101 and Original ITC 102, Shipper provided to Gatherer initial credit support ██████████████ When and as required pursuant to this section, Shipper shall provide Credit Support, including without limitation the Initial Credit Support, Incremental Credit Support (if any) and Additional Credit Support (if any), in one of the following forms, each of which shall constitute a form of reasonably satisfactory Credit Support:

    a.  A written Guaranty of payment from an Affiliate with credit satisfactory to Gatherer, but such guaranty of payment shall constitute an acceptable form of Credit Support only for as long as the credit of the Affiliate continues to be reasonably satisfactory to Gatherer;

    b.  An irrevocable letter of credit in a reasonably satisfactory form and from a Qualified Institution ("Qualified Institution" shall mean a major U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least $50 Billion U.S. Dollars and a credit rating of at least 'A-' by Standard & Poor's Ratings Services, or its successor, or a credit rating of at least 'A3' by Moody's Investors Service, or its successor, and is otherwise acceptable to Gatherer.); or

    c.  A prepayment or a deposit.

(B)    On an annual basis during the term of either ITC, Shipper shall provide its audited financial statements with footnotes and any other information requested by Gatherer to properly evaluate Shipper's financial condition.   In the event i) Shipper's financial condition has

deteriorated as compared to the FYE December 31, 2013 consolidated financial statements provided to Gatherer on September 22, 2014 such that Gatherer can reasonably substantiate grounds for insecurity, as evaluated by Gatherer on a non-discriminatory basis, based on consistent financial evaluation standards for determining the acceptability of Shipper's overall financial condition; or ii) Shipper experiences a material adverse change to its financial condition, which shall include only the following events: (a) qualified auditor's opinion relating to the financial statements which indicates significant uncertainty as to Shipper's ability to exist as a going concern; (b) adjudged litigation or final orders in a regulatory proceedings in State or Federal courts which is likely to cause a condition of insolvency, then Gatherer may hereby request incremental Credit Support in the amount of thirty (30) days of: (i) Gathering Demand Fee + (ii) Processing Demand Fee + (iii) T&F Demand Fee + (iv) Storage Demand Fee, all as escalated from time to time, (collectively, the "Fees") plus (v) any imbalance due to Gatherer from Shipper ("Incremental Credit Support"). The Incremental Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Incremental Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(C) Upon the occurrence of an Event of Default with respect to Shipper, then Shipper shall provide additional Credit Support to Gatherer within fifteen (15) business days of written demand to Shipper. The additional Credit Support shall be the lesser of: (i) four (4) months of Fees due from Shipper or ii) the number of months remaining in either or both ITCs ("Additional Credit Support"). Such Additional Credit Support shall be issued and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to time, unless such Additional Credit Support is modified by Gatherer in its reasonable discretion as outlined in (D) below.

(D) If Gatherer determines in its reasonable judgment that the Incremental Credit Support or Additional Credit Support is or are no longer required or the amounts of any such Credit Support can be reduced, Gatherer shall return any such excess Credit Support to Shipper within five (5) business days of its reasonable determination based upon Gatherer's annual assessment of the Shipper's financial statements which shall be conducted within sixty (60) calendar days of receipt of Shipper's annual audited financial statements; provided, however, upon the occurrence of an Event of Default with respect to Shipper pursuant to section (C) at any time during the term of either ITC, then Gatherer has the right to reinstate its requirement for Incremental Credit Support pursuant to section (B) and/or Additional Credit Support pursuant to section (C).

(E)     At any time while either or both ITCs is effective, if Gatherer determines that, as of such time, the issuer of any letter of credit in favor of Gatherer shall cease to be a Qualified Institution, then Gather may submit a written notice of such determination to Shipper (which notice shall provide Gatherer's basis for such determination), and within fifteen (15) business days after Shipper's receipt of such notice from Gather, Shipper shall deliver to Gatherer, and shall thereafter maintain, an irrevocable standby letter of credit in favor of Gatherer in a format acceptable to Gatherer and from a Qualified Institution.

11

(F) For any Credit Support in the form of an irrevocable standby letter of credit that is provided to Gatherer (any such letter of credit, "Shipper's Letter of Credit"), such Shipper's Letter of Credit shall permit partial draws and shall have an expiry date no sooner than twelve (12) calendar months after issuance thereof. With respect to any Shipper's Letter of Credit, Shipper shall furnish extensions or replacements of such letter of credit thirty (30) days prior to the expiration thereof, from time to time until the expiration of both ITCs. All extensions, amendments and replacements of any Shipper's Letter of Credit shall be delivered to Gatherer in the form of such outstanding Shipper's Letter of Credit, or in form otherwise satisfactory to Gatherer. Gatherer shall have the right to draw against any outstanding Shipper's Letter of Credit upon: (a) failure to make payment when due under either or both ITCs; or (b) the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit as provided herein. In the event of a draw in accordance with clause (a) of the preceding sentence, the proceeds of such draw shall be applied against any costs, expenses or damages incurred by Gatherer. In the event of a draw due to the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit, which draw may be in part or in whole, the proceeds of the draw shall be retained by Gatherer until Gatherer receives a replacement Shipper's Letter of Credit or until Gatherer does in fact incur any costs, expenses or damages as a result of a breach by Shipper of any of its obligations under either or both ITCs (in which event, such monies shall be applied against the same). If drawn in part or in whole, Shipper shall immediately thereafter provide a replacement Shipper's Letter of Credit in an amount equal to the amount drawn by Gatherer. Any draw made by Gatherer under an outstanding Shipper's Letter of Credit shall not relieve Shipper of any liabilities, deficiencies, costs, expenses or damages beyond what is drawn under such Shipper's Letter of Credit. Shipper's Letter of Credit (representing any undrawn portion thereof), to the extent it still remains, or any Credit Support in the form of cash deposit held by Gatherer shall be returned to Shipper on or before the thirtieth (30th) day after the later to occur of (i) the date on which both ITCs have terminated or expired and (ii) the date on which all of Shipper's performance and payment obligations under both ITCs (including, without limitation, any damages arising from either such agreement) have been fulfilled.

### ADDITIONAL COVENANTS, REPRESENTATIONS AND WARRANTIES:





13





**TERMINATION OF ORIGINAL ITC 101:** The Original ITC 101 is hereby terminated as of the Effective Date and superseded by the terms and conditions of this ITC.

[SIGNATURE PAGE FOLLOWS]

15

**IN WITNESS WHEREOF**, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

**ETC NORTHEAST PIPELINE, LLC**

By:_____

Name:_____

Title:_____

**SHIPPER**

**EM ENERGY PENNSYLVANIA, LLC**

By:_____

Name:_ BRIAN H. MCCURRIE

Title:_ CEO

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

ETC NORTHEAST PIPELINE, LLC

By: _____

Name: Mackie McCrea

Title: Chief Commercial Officer

**SHIPPER**

EM ENERGY PENNSYLVANIA, LLC

By: _____

Name: _____

Title: _____

Appendix 1

Area of Dedication



Area of Dedication
Bluestone Plant
Revolution
Cryo
MERCER CO.
LAWRENCE CO.
BEAVER CO.
BUTLER CO.
VENANGO CO.
ALLEGHENY CO.
WASHINGTON CO.
ARMSTRONG CO.
CLARION CO.
WESTMORELAND CO.
EdgeMarc Leasehold
Area of Dedication
Mark West Dedication

Exhibit A

The Gathering System



Exhibit B

Sample Calculation of Fee Adder



Exhibit B



Exhibit C

Form of Parent Capital Contribution Letter

Exhibit D

Form of Sponsor Commitment Letter

*Execution Version*

<center>

**AMENDED AND RESTATED
INDIVIDUAL TRANSACTION CONFIRMATION
(Gatherer's Contract No. 9532-102)
TO
AMENDED AND RESTATED
GATHERING AND PROCESSING AGREEMENT
BETWEEN EM ENERGY PENNSYLVANIA, LLC
AND
ETC NORTHEAST PIPELINE, LLC
DATED NOVEMBER 13, 2017**

</center>

**THIS AMENDED AND RESTATED INDIVIDUAL TRANSACTION CONFIRMATION** (this "<u>ITC</u>") is entered into effective as of the 13th day of November, 2017 ("<u>Effective Date</u>"), by and between ETC Northeast Pipeline, LLC ("<u>Gatherer</u>") and EM Energy Pennsylvania, LLC ("<u>Shipper</u>"). This ITC constitutes part of and is subject to all of the terms and provisions of the Base Agreement (collectively, the "<u>Agreement</u>"). All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Base Agreement, unless otherwise defined herein. Any discrepancy or conflict between any term contained in the Base Agreement and any term contained in this ITC shall be resolved in favor of this ITC.

<center>

<u>**WITNESSETH**</u>:

</center>

**WHEREAS,** Gatherer and Shipper entered into that certain Individual Transaction Confirmation dated April 17, 2015 (Gatherer's Contract No. 9532-102), as amended pursuant to that First Amendment to Individual Transaction Confirmation dated August 1, 2015 (as so amended, the "<u>Original ITC 102</u>");



WHEREAS, Gatherer and Shipper now desire to amend and restate the Original ITC 102, on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the premises and mutual covenants herein contained, and intending to be legally bound, Shipper and Gatherer do hereby stipulate and agree as follows:

**BASE AGREEMENT:** Amended and Restated Gathering and Processing Agreement dated November 13, 2017, Contract No. 9532-100.

**INDIVIDUAL TRANSACTION NUMBER:** 9532-102

**SHIPPER:** EM Energy Pennsylvania, LLC

**GATHERER:** ETC Northeast Pipeline, LLC

**TERM:** This Individual Transaction Confirmation shall be coterminous with that certain other Individual Transaction Confirmation between the Parties of even date herewith, ITC No. 9532-101 ("ITC 101").

**GATHERING SYSTEM:** The Gathering System to be constructed, owned and operated by Gatherer under this ITC is depicted in part on the map shown on Exhibit A hereto, as may be updated by mutual agreement of the Parties, and will be capable of (i) gathering the SRC from the Receipt Points upstream of the Constellation Compressor Station for delivery to the Constellation Delivery Point ("LP Gathering") and (ii) gathering the SRC from the Constellation Receipt Point to the Delivery Point ("HP Gathering").

The "Constellation Compressor Station" is owned and operated by Axip Energy Services, LP ("Axip"), and Shipper shall be responsible for the delivery of Gas from the inlet meter of the Constellation Compressor Station ("Constellation Delivery Point") to the inlet meter of the HP Gathering system ("Constellation Receipt Point"). Shipper shall cause Axip to deliver Gas to the Constellation Receipt Point against the operating pressures maintained in the HP Gathering system from time to time, which operating pressure shall not exceed 1300 Psig. Shipper shall be in control and possession of the Gas from the Constellation Delivery Point to the Constellation Receipt Point.



2



3







(A)   In conjunction with execution of the Original Agreement, the Original ITC 101 and Original ITC 102, Shipper provided to Gatherer initial credit support ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ When and as required pursuant to this section, Shipper shall provide Credit Support, including without limitation the Initial Credit Support, Incremental Credit Support (if any) and Additional Credit Support (if any), in one of the following forms, each of which shall constitute a form of reasonably satisfactory Credit Support:

  a. A written Guaranty of payment from an Affiliate with credit satisfactory to Gatherer, but such guaranty of payment shall constitute an acceptable form of Credit Support only for as long as the credit of the Affiliate continues to be reasonably satisfactory to Gatherer;

  b. An irrevocable letter of credit in a reasonably satisfactory form and from a Qualified Institution ("Qualified Institution" shall mean a major U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least $50 Billion U.S. Dollars and a credit rating of at least 'A-' by Standard & Poor's Ratings Services, or its

6

successor, or a credit rating of at least 'A3' by Moody's Investors Service, or its
successor, and is otherwise acceptable to Gatherer.); or

c.  A prepayment or a deposit.

(B)     On an annual basis during the term of either ITC, Shipper shall provide its audited
financial statements with footnotes and any other information requested by Gatherer to properly
evaluate Shipper's financial condition.   In the event i) Shipper's financial condition has
deteriorated as compared to the FYE December 31, 2013 consolidated financial statements
provided to Gatherer on September 22, 2014 such that Gatherer can reasonably substantiate
grounds for insecurity, as evaluated by Gatherer on a non-discriminatory basis, based on
consistent financial evaluation standards for determining the acceptability of Shipper's overall
financial condition; or ii) Shipper experiences a material adverse change to its financial
condition, which shall include only the following events: (a) qualified auditor's opinion relating
to the financial statements which indicates significant uncertainty as to Shipper's ability to exist
as a going concern; (b) adjudged litigation or final orders in a regulatory proceedings in State or
Federal courts which is likely to cause a condition of insolvency, then Gatherer may hereby
request incremental Credit Support in the amount of thirty (30) days of: (i) Gathering Demand
Fee + (ii) Processing Demand Fee + (iii) T&F Demand Fee + (iv) Storage Demand Fee, all as
escalated from time to time, (collectively, the "Fees") plus (v) any imbalance due to Gatherer
from Shipper  ("Incremental Credit Support"). The Incremental Credit Support shall be issued
and maintained by Shipper for the benefit of the Gatherer throughout the term of both ITCs, as
may be extended from time to time, unless such Incremental Credit Support is modified by
Gatherer in its reasonable discretion as outlined in (D) below.

(C) Upon the occurrence of an Event of Default with respect to Shipper, then Shipper shall
provide additional Credit Support to Gatherer within fifteen (15) business days of written
demand to Shipper. The additional Credit Support shall be the lesser of: (i) four (4) months of
Fees due from Shipper or ii) the number of months remaining in either or both ITCs ("Additional
Credit Support"). Such Additional Credit Support shall be issued and maintained by Shipper for
the benefit of the Gatherer throughout the term of both ITCs, as may be extended from time to
time, unless such Additional Credit Support is modified by Gatherer in its reasonable discretion
as outlined in (D) below.

(D) If Gatherer determines in its reasonable judgment that the Incremental Credit Support or
Additional Credit Support is or are no longer required or the amounts of any such Credit Support
can be reduced, Gatherer shall return any such excess Credit Support to Shipper within five (5)
business days of its reasonable determination based upon Gatherer's annual assessment of the
Shipper's financial statements which shall be conducted within sixty (60) calendar days of
receipt of Shipper's annual audited financial statements; provided, however, upon the occurrence
of an Event of Default with respect to Shipper pursuant to section (D) at any time during the term
of either ITC, then Gatherer has the right to reinstate its requirement for Incremental Credit
Support pursuant to section (B) and/or Additional Credit Support pursuant to section (C).

(E)     At any time while either or both ITCs is effective, if Gatherer determines that, as of such time, the issuer of any letter of credit in favor of Gatherer shall cease to be a Qualified Institution, then Gather may submit a written notice of such determination to Shipper (which notice shall provide Gatherer's basis for such determination), and within fifteen (15) business days after Shipper's receipt of such notice from Gatherer, Shipper shall deliver to Gatherer, and shall thereafter maintain, an irrevocable standby letter of credit in favor of Gatherer in a format acceptable to Gatherer and from a Qualified Institution.

(F) For any Credit Support in the form of an irrevocable standby letter of credit that is provided to Gatherer (any such letter of credit, "Shipper's Letter of Credit"), such Shipper's Letter of Credit shall permit partial draws and shall have an expiry date no sooner than twelve (12) calendar months after issuance thereof. With respect to any Shipper's Letter of Credit, Shipper shall furnish extensions or replacements of such letter of credit thirty (30) days prior to the expiration thereof, from time to time until the expiration of both ITCs. All extensions, amendments and replacements of any Shipper's Letter of Credit shall be delivered to Gatherer in the form of such outstanding Shipper's Letter of Credit, or in form otherwise satisfactory to Gatherer. Gatherer shall have the right to draw against any outstanding Shipper's Letter of Credit upon: (a) failure to make payment when due under either or both ITCs; or (b) the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit as provided herein. In the event of a draw in accordance with clause (a) of the preceding sentence, the proceeds of such draw shall be applied against any costs, expenses or damages incurred by Gatherer. In the event of a draw due to the failure or refusal of Shipper to deliver any applicable extension, amendment or replacement of an outstanding Shipper's Letter of Credit, which draw may be in part or in whole, the proceeds of the draw shall be retained by Gatherer until Gatherer receives a replacement Shipper's Letter of Credit or until Gatherer does in fact incur any costs, expenses or damages as a result of a breach by Shipper of any of its obligations under either or both ITCs (in which event, such monies shall be applied against the same). If drawn in part or in whole, Shipper shall immediately thereafter provide a replacement Shipper's Letter of Credit in an amount equal to the amount drawn by Gatherer. Any draw made by Gatherer under an outstanding Shipper's Letter of Credit shall not relieve Shipper of any liabilities, deficiencies, costs, expenses or damages beyond what is drawn under such Shipper's Letter of Credit. Shipper's Letter of Credit (representing any undrawn portion thereof), to the extent it still remains, or any Credit Support in the form of cash deposit held by Gatherer shall be returned to Shipper on or before the thirtieth (30th) day after the later to occur of (i) the date on which both ITCs have terminated or expired and (ii) the date on which all of Shipper's performance and payment obligations under both ITCs (including, without limitation, any damages arising from either such agreement) have been fulfilled.

## ADDITIONAL COVENANTS, REPRESENTATIONS AND WARRANTIES:



9





**TERMINATION OF ORIGINAL ITC 102:** The Original ITC 102 is hereby terminated as of the Effective Date and superseded by the terms and conditions of this ITC.

[SIGNATURE PAGE FOLLOWS]

11

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

GATHERER

ETC NORTHEAST PIPELINE, LLC

By:_____

Name:_____

Title:_____

SHIPPER

EM ENERGY PENNSYLVANIA, LLC

By:_____

Name: _BRIAN H. MCCULLIE_

Title: _CFO_

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals effective and operative as of the date first hereinabove written.

**GATHERER**

**SHIPPER**

**ETC NORTHEAST PIPELINE, LLC**

**EM ENERGY PENNSYLVANIA, LLC**

By: _____

By: _____

Name: Markie McCraw

Name: _____

Title: Chief Commercial officer

Title: _____

Appendix 1

Area of Dedication



Area of Dedication
Bluestone Plant
Revolution
Cryo
MERCER CO.
LAWRENCE CO.
VENANGO CO.
BUTLER CO.
BEAVER CO.
ALLEGHENY CO.
WASHINGTON CO.
ARMSTRONG CO.
WESTMORELAND CO.
CLARION CO.
EdgeMarc Leasehold
Area of Dedication
Mark West Dedication

Exhibit A

The Gathering System



Exhibit B

Form of Capital Contribution Letter

Exhibit C

Form of Sponsor Commitment Letter

## VERIFICATION

I, Alan G. Vaina, representative of ETC Northeast Pipeline, LLC being duly sworn according to law deposes and says that the facts set forth in the foregoing Complaint In Civil Action are true and correct to the best of my knowledge, information and belief. I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S. 4904 relating to unsworn falsification to authorities.

Representative of ETC Northeast Pipeline, LLC

Date: 2 . 7 . 19

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC

Plaintiff,

v.

EM ENERGY PENNSYLVANIA, LLC

Defendant.

CIVIL DIVISION

No. GD-19-002052

**Code:** 180 Declaratory Judgment

**ACCEPTANCE OF SERVICE**

Filed on behalf of Plaintiff

Counsel of Record for this Party:

Stuart H. Sostmann, Esquire
Pa. I.D. No. 84065

Gregory P. Graham, Esquire
Pa. I.D. No. 317205

MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

shsostmann@mdwcg.com
gpgraham@mdwcg.com

**JURY TRIAL DEMANDED**

412-803-1140 – phone
412-803-1188 - fax



# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC

      Plaintiff,

      v.

EM ENERGY PENNSYLVANIA, LLC

      Defendant.

CIVIL DIVISION

No. GD-19-002052

## ACCEPTANCE OF SERVICE

AND NOW this ___18th___ day of February, 2019, I hereby certify that I am authorized to accept service and do accept service of a true and attested copy of the original Complaint on behalf of Defendant EM Energy Pennsylvania, LLC.

Date: _2/18/19_

McGUIRE WOODS

_Megan Haines_

Megan S. Haines, Esquire
Counsel for Defendant

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Acceptance of Service has been served upon Counsel on this _19th_ day of February, 2019 via email and United States First-Class Mail, postage prepaid, addressed as follows:

Megan Haines, Esquire
McGuire Woods
mhaines@mcguirewoods.com
Tower Two-Sixty- Suite 1800
260 Forbes Avenue
Pittsburgh, PA 15222-3142

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN AND GOGGIN, P.C.

By: _____

Stuart H. Sostmann, Esquire
501 Grant Street, Floor 7
Pittsburgh, PA 15219
412-803-1179/412-803-1188 (fax)
Counsel for Plaintiff

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC

    Plaintiff,

    v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant.

CIVIL DIVISION

No. GD-19-002052

**Code:** 180 Declaratory Judgment

**PRAECIPE FOR APPEARANCE**

Filed on behalf of Defendant, EM ENERGY
PENNSYLVANIA, LLC

Counsel of Record for this Party:

Megan S. Haines, Esquire
Pa. I.D. No. 203590
McGuireWoods, LLP
Tower 260  18th Floor
260 Forbes Avenue
Pittsburgh, PA  15222
(412) 667-7920 - phone
(412) 402-4195 - fax

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice*
forthcoming)

**JURY TRIAL DEMANDED**


EXHIBIT
C

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC

    Plaintiff,

        v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant.

CIVIL DIVISION

No.  GD-19-002052

## PRAECIPE FOR APPEARANCE

Kindly enter the appearance of Megan S. Haines of McGuireWoods LLP as counsel for Defendant EM Energy Pennsylvania, LLC.

Respectfully submitted,

Dated:  February 27, 2019

/s/ Megan S. Haines
Megan S. Haines
McGuireWoods, LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
Phone: 412.667.6000
Fax: 412.667.6050
mhaines@mcguirewoods.com

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice* forthcoming)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Praecipe for Entry of Appearance has been served on counsel of record for Plaintiff by e-mail and first class mail delivery on this 27th day of February, 2019, addressed as follows:

Stuart H. Sostmann, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

/s/ Megan S. Haines_____

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC

    Plaintiff and Counterclaim Defendant,

    v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant and Counterclaim Plaintiff.

CIVIL DIVISION

No. GD-19-002052

**Code:** 180 Declaratory Judgment

**ANSWER, NEW MATTER, AND COUNTERCLAIMS**

Filed on behalf of Defendant and Counterclaim Plaintiff

Counsel of Record for this Party:

Megan S. Haines
PA ID No. 203590
McGuireWoods LLP
Tower Two Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222
mhaines@mcguirewoods.com
412-667-7920

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice* forthcoming)

**NOTICE TO PLEAD**

**YOU ARE HEREBY NOTIFIED TO FILE A WRITTEN RESPONSE TO THE ENCLOSED NEW MATTER AND COUNTERCLAIMS WITHIN TWENTY (20) DAYS FROM SERVICE HEREOF OR A JUDGMENT MAY BE ENTERED AGAINST YOU**

By: **/s/ Megan S. Haines**
    **Counsel for Defendant**

**JURY TRIAL DEMANDED**



**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

ETC NORTHEAST PIPELINE, LLC,

    Plaintiff and Counterclaim Defendant,

            v.

EM ENERGY PENNSYLVANIA, LLC,

    Defendant and Counterclaim Plaintiff.

CIVIL DIVISION

No.  GD-19-002052

### ANSWER, NEW MATTER, AND COUNTERCLAIMS

AND NOW, comes the Defendant, EM Energy Pennsylvania, LLC ("EdgeMarc"), by and through its counsel, McGuireWoods LLP and Davis Polk & Wardwell LLP, who responds to the Complaint of ETC Northeast Pipeline, LLC ("ETC") as follows:

### PRELIMINARY STATEMENT

On September 10, 2018, a segment of ETC's natural gas gathering and processing system ("Revolution System") located in Beaver County, Pennsylvania exploded ("Revolution Explosion").  Upon investigation, the Pennsylvania Department of Environmental Protection ("DEP") identified numerous violations of environmental regulations relating to erosion and sedimentation control, as well as earth stability, which resulted in a landslide and caused the Revolution Explosion.

DEP has repeatedly stated that ETC has failed to rectify the violations.  In October 2018, DEP issued a compliance order to resolve outstanding erosion and sedimentation issues and to stop all other earthwork associated with the Revolution System.  In light of ongoing compliance issues, on February 8, 2019, DEP took the rare step of invoking a permit block, suspending review of all clean water permit applications and other pending approvals for ETC, its parent, Energy Transfer LP ("Energy Transfer"), and their affiliates until further notice.  As Governor

1

Wolf summarized the same day, "[t]here has been a failure by Energy Transfer and its subsidiaries to respect our laws and our communities. This is not how we strive to do business in Pennsylvania, and it will not be tolerated."

EdgeMarc, an oil and gas exploration company with natural gas production in Western Pennsylvania, has been directly and continuously injured by ETC's failures of performance, including the Revolution Explosion. EdgeMarc had a contract with ETC for ETC: (1) to ship and process EdgeMarc's natural gas on the Revolution System; (2) to market and sell, on behalf of EdgeMarc, natural gas liquids (ethane and propane, principally) processed out of the natural gas for EdgeMarc by ETC; and (3) most importantly, to ultimately deliver, after gathering and processing, pipeline-quality natural gas for EdgeMarc from ETC's natural gas processing plant into the interstate natural gas pipeline system owned by ETC's affiliate, Rover Pipeline, LLC ("Rover"), via a natural gas lateral pipeline, also owned and operated by Rover. But after years of investment, *ETC never placed the Revolution System "in commercial service."* It was not "in commercial service" at the time of the Revolution Explosion, and it remains out of service to this day.

To make matters worse, ETC has taken every opportunity to use the Revolution Explosion to its benefit – contriving a post-explosion notice to EdgeMarc that ETC had finally placed the Revolution System "in commercial service" mere hours before the explosion, concocting a second post-explosion notice to EdgeMarc asserting that the Revolution Explosion was an "act of God" and cured its obligations under applicable contracts, fabricating invoices to EdgeMarc as if the Revolution Explosion had never happened, and demanding over $7.3 million in credit support based on these purported invoices.

2

As a result, this dispute is not about EdgeMarc's alleged failure to pay $400,000 for services not rendered. It is about ETC's own failure to perform under clear contracts between the parties, and millions of dollars of resulting damage that EdgeMarc has suffered, and continues to suffer, due to ETC's nonperformance.

## ANSWER

I.   **INTRODUCTION**[1]

1.    Denied. Paragraph 1 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 1 and respectfully refers the Court to (i) the Amended and Restated Gathering and Processing Agreement between EdgeMarc and ETC, dated November 13, 2017 (the "Gathering and Processing Agreement"), (ii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-101), dated November 13, 2017 ("ITC-101"), and (iii) the Amended and Restated Individual Transaction Confirmation (Gatherer's Contract No. 9532-102), dated November 13, 2017 ("ITC-102"), (together, the "Agreements") for the contents of the Agreements. EdgeMarc denies any characterization of the Agreements.

2.    Denied. Paragraph 2 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that the "Guaranteed In-Service Date" was January 1, 2019. EdgeMarc otherwise denies the allegations in Paragraph 2, and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

---

[1] EdgeMarc incorporates certain headings contained in ETC's Complaint for the Court's convenience only. Their inclusion is not an admission of the contents thereof, which is expressly denied.

3.      Denied.  Paragraph 3 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies that the Revolution System was placed "in commercial service" on September 9, 2018 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

4.      Denied in part.  EdgeMarc denies the allegations in Paragraph 4, except that it admits that it received a notice from ETC on September 10, 2018.  EdgeMarc respectfully refers the Court to the notice for its contents.  EdgeMarc denies any characterization of the Agreements.

5.      Denied.  Paragraph 5 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 5 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

6.      Denied.  Paragraph 6 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that EdgeMarc sent a notice to ETC on January 29, 2019, otherwise denies the allegations in Paragraph 6, and respectfully refers the Court to the Agreements and the notice for their contents.  EdgeMarc denies any characterization of the Agreements.

7.      Denied.  Paragraph 7 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies that ETC is entitled to declaratory relief.

4

## II.   PARTIES

8.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.  Therefore, the allegations of Paragraph 8 are denied.

9.      EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.  Therefore, the allegations of Paragraph 9 are denied.

10.     Denied.  Paragraph 10 purports to state legal conclusions as to which no response is required.

11.     Denied in part.  EdgeMarc admits the allegations in the first sentence of Paragraph 11, admits that it has a place of business at 1800 Main Street, Suite 220, Canonsburg, Pennsylvania, and otherwise denies the allegations in Paragraph 11.

## III.   JURISDICTION, VENUE, AND GOVERNING LAW

12.     Paragraph 12 purports to state legal conclusions as to which no response is required.

13.     Paragraph 13 purports to state legal conclusions as to which no response is required.

14.     Paragraph 14 purports to state legal conclusions as to which no response is required.

15.     Paragraph 15 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 15. EdgeMarc specifically denies that ETC is entitled to relief under the Declaratory Judgments Act.

16.     Paragraph 16 purports to state legal conclusions as to which no response is required.

17.     Paragraph 17 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 17.

18.     Paragraph 18 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits that redacted versions of the Agreements appear to be attached as Exhibits A and B to the Complaint. EdgeMarc otherwise denies the allegations in Paragraph 18 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

## IV.     FACTUAL BACKGROUND

19.     Admitted.

20.     Denied. Paragraph 20 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

21.     Denied. Paragraph 21 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

22.     Denied. Paragraph 22 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

23.     Denied. Paragraph 23 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

24.     Denied.  Paragraph 24 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

25.     Admitted.

26.     Paragraph 26 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that ETC has accurately quoted a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their contents.

27.     Paragraph 27 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits that ETC has accurately quoted a provision of ITC-101 and otherwise respectfully refers the Court to the Agreements for their contents.

28.     Paragraph 28 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

29.     Denied.  EdgeMarc denies the allegations in Paragraph 29.

30.     Denied.  EdgeMarc denies the allegations in Paragraph 30.

31.     Denied.  Paragraph 31 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 31 and respectfully refers the Court to the Agreements for their contents.  EdgeMarc denies any characterization of the Agreements.

32.     Denied.  EdgeMarc denies the allegations in Paragraph 32.

33.     Denied.  EdgeMarc denies the allegations in Paragraph 33.

7

34. Denied. EdgeMarc denies the allegations in Paragraph 34.

35. Denied. Paragraph 35 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 35.

36. Denied. The allegations of Paragraph 36 refer to a letter agreement, a document which speaks for itself. EdgeMarc respectfully refers the Court to the letter agreement for its contents and EdgeMarc denies any characterization thereof.

37. Denied. EdgeMarc denies the allegations in Paragraph 37. EdgeMarc specifically denies that gas provided to ETC on September 9, 2018 was provided for "commercial service."

38. Denied. The allegations in Paragraph 38 refer to a Transaction Confirmation, which speaks for itself. EdgeMarc refers the Court to the Transaction Confirmation for its contents and denies any characterization thereof. By way of further response, EdgeMarc denies the allegations in Paragraph 38.

39. Denied in part. EdgeMarc denies the allegations in Paragraph 39, except that it admits that it received a notice from ETC on September 10, 2018.

40. Denied. Paragraph 40 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 40 and respectfully refers the Court to the Agreements for their contents. EdgeMarc denies any characterization of the Agreements.

41. Denied. Paragraph 41 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 41 and respectfully refers the Court to the Agreements for their contents.

42.    Denied. EdgeMarc denies the allegations in Paragraph 42.

43.    Denied as stated. EdgeMarc denies the allegations in Paragraph 43 as stated.

44.    Denied. EdgeMarc lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45.    Denied. EdgeMarc denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 45. EdgeMarc otherwise denies the allegations in Paragraph 45 and respectfully refers the Court to the Agreements for their contents.

46.    Denied. EdgeMarc denies the allegations in Paragraph 46.

47.    Denied. EdgeMarc denies the allegations in Paragraph 47.

48.    Denied in part. EdgeMarc admits that ETC purported to send it invoices under ITC-101 on February 1, 2019, and otherwise denies the allegations in Paragraph 48.

49.    Denied as stated. EdgeMarc admits only that it received a notice from ETC on January 17, 2019. EdgeMarc denies the remaining allegations of Paragraph 49.

50.    Denied. Paragraph 50 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 50 and respectfully refers the Court to the Agreements for their contents.

51.    Denied. Paragraph 51 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 51.

52.    Denied in part. Paragraph 52 references a January 22, 2019 letter, which speaks for itself. EdgeMarc refers the Court to the letter for its contents and denies any characterization

thereof. By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019. The remaining allegations are denied.

53. Denied in part. Paragraph 53 references a January 22, 2019 letter, which speaks for itself. EdgeMarc refers the Court to the letter for its contents and denies any characterization thereof. By way of further response, EdgeMarc admits only that EdgeMarc sent ETC a letter on January 22, 2019. The remaining allegations are denied.

54. Paragraph 54 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits only that it received a letter from ETC on January 29, 2019. The remaining allegations are denied.

55. Denied in part. EdgeMarc admits only that it sent ETC a letter on January 29, 2019. The remaining allegations are denied.

56. Denied in part. Paragraph 56 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc admits only that it continues to be willing to perform its obligations under the Gathering and Processing Agreement. The remaining allegations are denied.

57. Admitted.

58. Denied. Paragraph 58 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 58 and respectfully refers the Court to the Agreements for their contents.

## V. CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT

59. EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

60.     Denied.  Paragraph 60 purports to state legal conclusions as to which no response is required.

61.     Denied.  Paragraph 61 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 61.

62.     Denied.  Paragraph 62 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc admits only that ETC did not meet the Guaranteed In-Service Date under ITC-101.  The remaining allegations are denied.

Answering the "WHEREFORE" clause following Paragraph 62, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

## COUNT II:  BREACH OF CONTRACT

63.     EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

64.     Denied.  Paragraph 64 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 64 and respectfully refers the Court to the Agreements for their contents.

65.     Denied.  Paragraph 65 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 65.

66.     Denied.  Paragraph 66 purports to state legal conclusions as to which no response is required.  To the extent a response is required, EdgeMarc denies the allegations in Paragraph 66.

Answering the "WHEREFORE" clause following Paragraph 66, EdgeMarc denies that ETC is entitled to any recovery or relief whatsoever.

## COUNT III: UNJUST ENRICHMENT

67. EdgeMarc incorporates its responses to the foregoing paragraphs as if fully set forth herein.

68. Denied. Paragraph 68 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 68.

69. Denied. Paragraph 69 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 69.

70. Denied. Paragraph 70 purports to state legal conclusions as to which no response is required. To the extent a response is required, EdgeMarc denies the allegations in Paragraph 70.

Answering the "WHEREFORE" clause following Paragraph 70, EdgeMarc denies that ETC is entitled to any judgment, recovery, or relief whatsoever.

## VI.    JURY DEMAND

71. No response to the ETC's jury demand in Paragraph 71 is required. To the extent a response is required, EdgeMarc reserves the right to move to strike ETC's jury demand.

Answering the "Relief Requested" clause following Paragraph 71, EdgeMarc denies that ETC is entitled to any judgment, recovery or relief whatsoever.

## NEW MATTER

72.    EdgeMarc asserts the following defenses without assuming the burden of any such defense that would otherwise rest on ETC, and with reservation of its right to amend or supplement its Answer and New Matter for any reason, including based upon evidence developed in discovery or otherwise.

73.    The Complaint, and each claim for relief asserted therein, fails to state a claim upon which relief can be granted.

74.    ETC's claims are precluded, in whole or in part, by the doctrine of unclean hands.

75.    ETC's claims are barred, in whole or in part, because it has not suffered any injury or damages and/or suffered any recoverable damages.

76.    Although EdgeMarc denies that ETC suffered any damages as alleged in the Complaint, any damages that may have been sustained were not caused by any actions or omissions by EdgeMarc.

77.    ETC's claims are barred, in whole or in part, by ETC's failure to mitigate any damages incurred.

78.    ETC's claims are barred, in whole or in part, by the doctrine of failure of consideration.

79.    ETC's claims are barred, in whole or in part, because ETC materially breached the Agreements.

80.    ETC's claims are barred, in whole or in part, to the extent that EdgeMarc's alleged actions were justified.

81.    ETC's claims are barred, in whole or in part, by EdgeMarc's payment for all services actually received and properly invoiced.

13

82.     ETC's claims are barred, in whole or in part, by impossibility of performance.

83.     ETC's claims are barred, in whole or in part, by estoppel.

84.     EdgeMarc acted reasonably and in good faith at all times based on all relevant facts and circumstances known by it at the time it so acted.

WHEREFORE, having denied the material allegations against it, and having asserted its affirmative defenses to ETC's Complaint, EdgeMarc respectfully requests that the Court dismiss the Complaint, and award it costs and fees, as well as all other relief the Court deems just and proper.

## COUNTERCLAIMS

85.     EdgeMarc incorporates by reference the above responses and assertions as if set forth fully herein.

### I.      INTRODUCTION

86.     EdgeMarc, an oil and gas exploration company based in Pennsylvania, produces clean-burning natural gas from the Appalachian Basin.  To bring its natural gas to the market, EdgeMarc contracted with ETC, a subsidiary of Energy Transfer, to gather, process, and transport its gas.  As part of this agreement, ETC agreed to build and operate the Revolution System in western Pennsylvania, and EdgeMarc committed to ship and have its natural gas processed and delivered on this system.

87.     Despite the agreement, the Revolution System is not currently "in commercial service," nor has it ever been.  As a result, EdgeMarc is suffering substantial financial losses each and every day that ETC fails to gather, process, and transport EdgeMarc's gas.  Despite EdgeMarc's adherence to the terms of its agreements with ETC, EdgeMarc is now unable to transport its natural gas to the market for one main reason:  ETC failed to comply with pertinent environmental regulations and prudent pipeline construction guidelines.  The direct consequence of ETC's conduct – including its well-documented failures to undertake necessary erosion and sediment control measures – was a landslide during the buildout of the Revolution System, resulting in a segment of pipeline in Beaver County being displaced down a hill which caused a pipeline rupture and explosion on September 10, 2018.

88.     ETC's first instinct was to use the Revolution Explosion to its benefit.  Several hours after the Revolution Explosion, ETC claimed that the Revolution System was "in commercial service" as of the prior day, September 9, 2018.  That same day, ETC claimed that

the Revolution Explosion constituted a Force Majeure event – or an "act of God" – under the Agreements. The notices to EdgeMarc were prepared in such haste that one initially identified the wrong company and was only later corrected to identify EdgeMarc. (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

89.  The Revolution Explosion was not an act of God. Indeed, ETC's compliance failures are well documented. For example, after the Revolution Explosion, inspectors from the DEP inspected portions of pipeline on the Revolution System, interviewed workers, and subpoenaed documents in an effort to determine whether ETC's parent, Energy Transfer, was meeting all of its permit obligations.[2] Three days after the Revolution Explosion, a DEP inspector stated that the measures that Energy Transfer took to prevent erosion were "improperly installed, maintained and failed."[3]

90.  Shortly thereafter, on October 29, 2018, the DEP issued a Compliance Order ("October 2018 DEP Order") commanding ETC to stop all work on pipeline on the Revolution System, stabilize the area around the pipeline, repair erosion controls, and submit several plans outlining how to move forward. In the October 2018 DEP Order, the DEP concluded in no uncertain terms that ETC had "[f]ail[ed] to implement or maintain effective erosion and sediment control best management practices . . . , as required by [Pennsylvania Code], that minimize the potential for accelerated erosion and sedimentation . . . ." (Exhibit C (October 2018 DEP Order).)

---

[2] *See* Reid Frazier, *DEP orders ETP to fix Revolution Pipeline erosion problems,* WHYY (a partner of NPR and PBS) (Oct. 31, 2018), https://whyy.org/articles/dep-orders-etp-to-fix-revolution-pipeline-erosion-problems/.

[3] *See* Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast,* PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

91.    The October 2018 DEP Order also found that ETC "[f]ail[ed] to provide temporary stabilization, as required by [Pennsylvania Code], upon temporary cessation of earth disturbance activities." Finally, the October 2018 DEP Order stated that ETC "has failed to notify the Department of its inspection results and has failed to submit noncompliance reports." Accordingly, the DEP required ETC to "report all inoperative or ineffective controls to the Department . . . and provide a written noncompliance report within five (5) days." (Exhibit C (October 2018 DEP Order).)

92.    Both before and after the October 2018 DEP Order, ETC racked up regulatory violation after regulatory violation concerning its work on the Revolution System. Between September 13, 2018 and January 17, 2019, the DEP conducted site-level and primary facility-level inspections on pipeline on the Revolution System. In total, the inspections revealed that ETC had committed around 200 "erosion and sediment control" violations, "site stabilization-temporary stabilization" violations, and "general requirements" violations related to failure to meet erosion and sediment control best management practices.[4]

93.    ETC failed to resolve the violations and satisfy the October 2018 DEP Order. On January 10, 2019, after several months of ongoing violations and a lack of remediation effort, the DEP informed ETC in a letter that it was not in compliance with the October 2018 DEP Order. The letter specifically stated that despite the Order, ETC has failed to, among other things, "continuously implement and maintain [erosion and sediment control best management practices]," and "temporarily stabilize all disturbed areas, including ongoing mass earth movement" as required by the Order. The DEP's letter also stated that ETC had failed to submit

_____

[4] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/searchResults_singleSite.aspx?SiteID=817832 (last visited February 17, 2019).

to the DEP an adequate "Temporary Stabilization Plan," an "Erosion and Sediment Control Plan," and a "Post Construction Stormwater Management Plan" as required by the Order. (Exhibit D (January 10, 2019 letter from DEP to ETC).)

94.     ETC's failure to take adequate erosion and sedimentation control measures is also problematic because months prior to the September 2018 Revolution Explosion, ETC was on notice that the area where the explosion occurred was problematic, as "[t]his stretch of the pipeline ha[d] been a problem for Energy Transfer before." Namely, in a consent agreement and order from summer 2018, Energy Transfer "was fined and cited for a series of erosion events that took place about a mile from the explosion site."[5]

95.     ETC itself admitted that the area of the Revolution Explosion site was a cause for serious concern. Media outlets reported that according to Energy Transfer's permit documents, "the area where the pipeline burst is on a slope of more than 20 degrees, with even steeper areas nearby," "[t]he type of soil on the site is considered to have 'high' potential for erosion, and a field survey of a wetland a few hundred feet down the pipeline's path was *categorized by the company* as having a 'slip landslide area' and 'dangerous and unstable hillslope terrain.'"[6]

96.     As a result of ETC's conduct, the DEP has suspended all reviews of clean water permit applications and other pending approvals for Energy Transfer and its subsidiaries due to ETC's failure to comply with the October 2018 DEP Order. In announcing the suspension, the DEP Secretary stated that DEP inspections following the Revolution Explosion discovered violations including "unreported landslides, impacts to aquatic resources, construction activities

occurring in unpermitted areas, and several sections of the pipeline that required the installation of additional measures to prevent accelerated erosion."[7]

97.     Public information, government statements, and media coverage make abundantly clear that the Revolution Explosion is a classic case of history repeating itself.   For example, upon information and belief, the U.S. Pipeline and Hazardous Materials Safety Administration (PHMSA) has issued 106 violations to Energy Transfer and its Sunoco subsidiary since 2002, resulting in over $5.6 million in fines.  These safety violations included, among others, "[f]ailure to repair unsafe pipe for 5 years," "[f]ailures to maintain pipeline integrity in high consequence areas," "[f]ailure to report unsafe conditions," and "[f]ailure to do corrosion inspection."  Upon information and belief, Energy Transfer and its subsidiaries and joint ventures reported 527 hazardous liquids pipeline incidents to federal regulators between 2002 and 2017, or once every 11 days on average for 16 years.[8]

98.     A Reuters analysis of government data and regulatory records showed that Energy Transfer and its Sunoco subsidiary have racked up "more than 800 state and federal permit violations" in a race to build Rover and Mariner East 2, two large pipelines that carry natural gas from Pennsylvania, Ohio, and West Virginia.  These violations included "spills of drilling fluid, . . . sinkholes in backyards[,] and improper disposal of hazardous waste and other trash."[9]

---

[7] Press Release, Commonwealth of Pennsylvania Department of Environmental Protection, *Department of Environmental Protection Issues Hold on All Energy Transfer Clean Water Permit Approvals and Modifications Due to Non-Compliance* (Feb. 8, 2019), http://www.ahs.dep.pa.gov/NewsRoomPublic/ articleviewer.aspx?id=21634&typeid=1.

[8] U.S. Pipeline and Hazardous Materials Safety Administration data, as summarized by Greenpeace USA & Waterkeeper Alliance, *Oil and Water: ETP & Sunoco's History of Pipeline Spills* 3, 4, 6 (2018), https://www.greenpeace.org/usa/wp-content/uploads/2018/04/oil-water-04.17-MECH.pdf.

[9] Scott DiSavino, Stephanie Kelly, *Two U.S. pipelines rack up violations, threaten industry growth*, REUTERS (Nov. 28, 2018), https://www.reuters.com/article/us-usa-pipelines-etp-violations-insight-idUSKCN1NX1E3.

99.     The direct consequence of this pattern of conduct by ETC was the September 10, 2018 Revolution Explosion.  Despite ETC's deliberate efforts to mischaracterize this explosion as an act of God, all available information makes clear that the explosion and its causes were within ETC's reasonable control.

## PARTIES

100.    Counterclaim Plaintiff EdgeMarc is a Delaware limited liability company, with its principal office in Canonsburg, Pennsylvania.  EdgeMarc is an oil and gas exploration and production company operating in, among other places, Pennsylvania.

101.    Counterclaim Defendant ETC is a Delaware limited liability company with an office located at 6051 Wallace Road Ext, Suite 300, Wexford, Pennsylvania.  ETC constructs and operates natural gas gathering and processing systems in Pennsylvania.

## JURISDICTION AND VENUE

102.    This action arises under the laws of the Commonwealth of Pennsylvania and is within the subject matter jurisdiction of this Court, pursuant to 42 Pa. Cons. Stat. § 931.

103.    Subject matter jurisdiction exists in this case pursuant to the Declaratory Judgments Act, 42 Pa. Cons. Stat. § 7531 *et seq.*

104.    An award of declaratory relief would remove uncertainty and lead to resolution of the dispute.  42 Pa. Cons. Stat. § 7537.

105.    This Court has personal jurisdiction over ETC because ETC's principal place of business is in the Commonwealth of Pennsylvania.  42 Pa. Cons. Stat. § 5301(a)(2).

106.    This Court also has personal jurisdiction over ETC because this action arises directly out of ETC's agreement to build the Revolution System in the Commonwealth of Pennsylvania and carry EdgeMarc's gas on the Revolution System.  42 Pa. Cons. Stat. § 5308.

107.    Venue for this action is proper in this Court pursuant to Pennsylvania Rules of

Civil Procedure 1006 & 2179 because ETC regularly conducts business in Allegheny County.

## FACTUAL BACKGROUND

**I.     The Gathering and Processing Agreement, ITC-101, and ITC-102**

108.    On November 13, 2017, the parties entered into the amended and restated

Gathering and Processing Agreement, which provides that "[ETC] agrees to accept, or cause to

be accepted, on a Firm basis those daily quantities of [EdgeMarc's] Gas as set forth in any

Individual Transaction Confirmation." (Gathering and Processing Agreement at § 6.3).

109.    Under the Gathering and Processing Agreement, ETC must reserve capacity for

EdgeMarc's natural gas. That amount is defined as the "Shipper's Reserved Capacity," or

"SRC," which is "the portion of the aggregate daily gathering and processing capacity reserved

for [EdgeMarc] for Firm Service in the Gathering System and the Plant." (Gathering and

Processing Agreement at § 1.1).

110.    On the same day that they entered into the Gathering and Processing Agreement,

the parties also entered into two "Individual Transaction Confirmations," or "ITCs," which

"evidenc[e] the specific terms of a Transaction . . . but which shall be subject to the terms and

conditions of th[e] [Gathering and Processing Agreement]." (Gathering and Processing

Agreement at § 1.1). These two ITCs are ITC-101 and ITC-102, and ITC-101 governs the

pipeline where the Revolution Explosion took place in Beaver County on September 10, 2018.

111.    Under ITC-101, ETC agreed to "construct[], own[] and operate[]" a "Gathering

System" to receive EdgeMarc's natural gas from certain "Receipt Points" in Butler County and

deliver that gas to the "Delivery Point." Specifically, the "Gathering System" that ETC would

build under ITC-101 had to "be capable of (i) gathering the SRC from the Receipt Points . . . for

delivery to the Galaxy Compressor Station ('LP-Galaxy Gathering'), (ii) compressing and

dehydrating the SRC at the Galaxy Compressor Station ('Galaxy Compression'), (iii) gathering,

via [ETC's] high pressure gas pipeline ('HPGP'), the SRC from the Galaxy Compressor Station

to [ETC's Revolution I cryogenic processing] Plant ('HP Gathering') and (iv) gathering Residue

Gas from the Plant for delivery to the Delivery Point." (ITC-101 at 2).

112.   ITC-101 defines "Delivery Point" as "inlet flange of the measurement facilities of

Rover Pipeline, LLC, located at or near the tailgate of the [ETC Revolution I cryogenic

processing] Plant" in Washington County. (ITC-101 at 6).

113.   ITC-102 is "coterminous with" ITC-101. (ITC-102 at 2).

**II.    ITC-101 and the Revolution Explosion**

114.   Under ITC-101, the "In-Service Date" is defined as "[t]he first Day of the Month

following the Day on which the LP-Galaxy Gathering . . . , Galaxy Compression, HPGP, HP

Gathering, Plant and Delivery Point are <u>completed and placed in commercial service</u> . . . ."

(ITC-101 at 3) (emphasis added).

115.   ETC also agreed to an outside date by which the Revolution System would be

completed and placed "in commercial service." That "Guaranteed In-Service Date" was January

1, 2019. (ITC-101 at 2). If ETC failed to meet the "Guaranteed In-Service Date," EdgeMarc

had an express right to "terminate this ITC upon written notice to [ETC] within thirty (30) Days

of the Guaranteed In-Service Date." (ITC-101 at 5).

116.    ETC's buildout of the Revolution System was marked by delays and problems.
For example:

      a.    In a consent agreement and order from summer 2018, Energy
Transfer "was fined and cited for a series of erosion events" that took place about
a mile from the site of the Revolution Explosion;[10]

      b.    Between September 2018 and January 2019, DEP inspections of
pipeline on the Revolution System revealed that ETC had committed
approximately 200 "erosion and sediment control" violations, "site stabilization-
temporary stabilization" violations, and "general requirements" violations related
to failure to meet erosion and sediment best management practices;[11]

      c.    In October 2018, the DEP concluded that ETC had "[f]ail[ed] to
implement or maintain effective erosion and sediment control best management
practices, as required by [Pennsylvania Code], that minimize the potential for
accelerated erosion and sedimentation . . . ." (Exhibit C (October 2018 DEP
Order).)

117.    On September 10, 2018, because of ETC's continued and well-documented
failure to implement necessary erosion and sedimentation control measures, a segment of
pipeline on the Revolution System in Beaver County slipped down a hill, ruptured, and
exploded.

---

    [10] Anya Litvak, *State DEP says company not complying with order after Beaver County pipeline blast,*
PITTSBURGH POST-GAZETTE (Jan. 18, 2019), https://www.post-gazette.com/business/powersource/2019/01/18/DEP-
Energy-Transfer-Beaver-County-pipeline-blast-Revolution-Center/stories/201901200044.

    [11] Pennsylvania Department of Environmental Protection, https://www.ahs.dep.pa.gov/eFACTSWeb/
searchResults_singleSite.aspx?SiteID=817832) (emphasis added) (last visited February 17, 2019).

118.     Rather than working to remediate the problems and bring the Revolution System into "commercial service," ETC contrived two notices on the day of the Revolution Explosion: the first notice asserted that the Revolution System had been placed "in commercial service" on September 9, 2018, while the second notice asserted that the Revolution Explosion constituted a "Force Majeure" under Section 16.1 of the Gathering and Processing Agreement. (Exhibit A (September 10, 2018 in-service notice); Exhibit B (September 10, 2018 Force Majeure notice).)

119.     In support of its factually inaccurate position that the Revolution System had been placed "in commercial service" mere hours before it exploded, ETC later issued invoices to EdgeMarc under ITC-101 – as if the Revolution Explosion never happened – for certain natural gas that was never gathered, processed, or delivered under ITC-101. More to the point, prior to the Revolution Explosion, ETC had issued such invoices under a separate billing arrangement.

120.     Notwithstanding ETC's post-explosion efforts to assert that the Revolution System was in "commercial service" as of September 9, 2018 for purposes of ITC-101, the system was not "in commercial service" as of that date (nor has it ever been "in commercial service") for at least three reasons.

121.     First, for the Revolution System to be in commercial service, all portions of it – including the "Delivery Point" – needed to be in commercial service. However, ETC needed to receive authorization from the Federal Energy Regulatory Commission ("FERC") to place the Revolution Delivery Point in commercial service, and ETC had not received that authorization on September 9 or September 10, 2018. In fact, publicly available information from FERC makes clear that the Revolution Delivery Point was not in service until October 12, 2018, a full five weeks after the September 10, 2018 Revolution Explosion and ETC's purported "in

24

commercial service" date of September 9, 2018. (Exhibit E (Letter from Rover Pipeline LLC to FERC, dated October 15, 2018).)

122.   Second, the Revolution System also could not be in commercial service until it underwent a multi-step commissioning process, which can take weeks to complete. As of September 9, 2018, ETC and EdgeMarc had only just begun this commissioning process. As part of this commissioning process, ETC agreed to purchase limited volumes of natural gas to "purge and pack" the Revolution System. Upon information and belief, the purge and pack process was not complete at the time of the Revolution Explosion, and even if that step were complete, it *by definition did not involve the gathering, processing, and delivering of EdgeMarc's gas*.

123.   Third, and relatedly, the Revolution System could not have been in commercial service as of September 9, 2018 because none of EdgeMarc's natural gas was ever commercially available to its customers.

124.   ETC has asserted that the Revolution Explosion constituted an act of God, and that ETC's failure to perform under ITC-101 and the Gathering and Processing Agreement is cured by section 16.1 of the Gathering and Processing Agreement. That provision provides that "[u]nless expressly provided otherwise in this Agreement, no Party shall be liable to any other Party for failure to perform any of its obligations under this Agreement, other than to make payments due, to the extent that and for the period during which such performance is hindered, delayed or prevented by Force Majeure." (Gathering and Processing Agreement at § 16.1).

125.    The Gathering and Processing Agreement defines a "Force Majeure" as one of a series of events "beyond the reasonable control" of the party seeking to invoke the provision:

> [C]auses, conditions, events or circumstances which are **beyond the reasonable control of the party claiming Force Majeure** [and] shall include, without limitation, **to the extent beyond the reasonable control of the Party claiming Force Majeure**, acts of God, wars (declared or undeclared), insurrections, hostilities, strikes, lockouts, riots, floods, fires, acts of nature, industrial disturbances, acts of the public enemy, acts of terrorism, sabotage, blockades, epidemics, landslides, lightning, earthquakes, washouts, arrests and restraints of rulers and peoples, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, or blockages of lines of pipe not due to lack of maintenance, extraordinary operating conditions on [ETC's], [EdgeMarc's] or [EdgeMarc's] facilities or on those of any Downstream Transporter or NGL pipeline, Force Majeure events on any Downstream Transporter or NGL pipeline, inability of any Party to obtain necessary machinery, materials, permits, refusal of one or more landowners to provide necessary easements or rights-of-way, freezing of any well or delivery facility, well blowout, cratering, the partial or entire failure of a well and the act, order, rule or regulation of any court or governmental authority prohibiting a Party from discharging its obligations under this Agreement, **and any other causes whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension**.

(Gathering and Processing Agreement at § 16.1) (emphasis added).

126.    ETC implemented inadequate erosion and sediment control measures while constructing the Revolution System, had been cited for an unusually high number of permit violations, and had knowingly failed to report to state regulators that there had been landslides and erosion from the pipeline's construction.  Under these circumstances, the Revolution Explosion was not "beyond the reasonable control" of ETC and thus did not constitute a Force Majeure.

127.    Section 16.1 of the Gathering and Processing Agreement also provides that "no Party shall be entitled to the benefits of this Section 16.1 to the extent the event of Force Majeure

26

is caused or affected by any or all of the following circumstances . . . *the Party claiming excuse failed to remedy the condition and to resume the performance of its covenants or obligations with reasonable dispatch*." (Gathering and Processing Agreement at § 16.1) (emphasis added). ETC was not entitled to rely on the Force Majeure provision because it failed to "remedy the condition" and failed to resume performance "with reasonable dispatch."

128.   The Gathering and Processing Agreement also required that "[a] Party claiming Force Majeure shall use commercially reasonable efforts to remove the cause, condition, event or circumstance of such Force Majeure . . . ." (Gathering and Processing Agreement at § 16.3). However, ETC's efforts have been anything but commercially reasonable; the restoration period for the affected pipeline could exceed twelve months, even though ETC's initial estimate was six to eight weeks.

## III.   Shipping and Processing Requirements Under ITC-101

129.   ETC was obligated to "accept . . . on a Firm basis those daily quantities" of natural gas set forth in ITC-101. (Gathering and Processing Agreement at § 6.3). For example, for the period between November 1, 2018 and April 30, 2019, ETC was obligated to accept 65,000 Mcfd of natural gas from EdgeMarc. (ITC-101 at 4).

130.   ETC's obligation to accept the required quantities of natural gas from EdgeMarc under ITC-101 until the January 29, 2019 termination of ITC-101 was not excused by the Revolution Explosion because that was not a Force Majeure event.

## IV.   Termination of ITC-101

131.   Because ETC failed to meet the "Guaranteed In-Service Date" of January 1, 2019, EdgeMarc was entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5).

132.    Accordingly, on January 29, 2019, EdgeMarc provided written notice to ETC that it was terminating ITC-101 "effective January 29, 2019" under ITC-101's provision for "Failure to Meet Guaranteed In-Service Date." (Exhibit F (notice terminating ITC-101 and ITC-102).) Likewise, ITC-102 "terminated by operation of contract because it is expressly coterminous with ITC-101." *Id.*

133.    Despite the termination of ITC-101 and ITC-102 on January 29, 2019, the Gathering and Processing Agreement remained fully effective. Under the Gathering and Processing Agreement, EdgeMarc is entitled to "submit Nominations . . . for the gathering of Gas hereunder to [ETC]." (Gathering and Processing Agreement at § 6.4).

134.    Accordingly, on January 30, 2019, EdgeMarc submitted Nominations for the quantity of natural gas that it expected to deliver to ETC for the month of February 2019. Despite its obligation to gather and process that gas pursuant to the Gathering and Processing Agreement, ETC refused to do so. (Exhibit G (January 30, 2019 Nomination); Exhibit H (January 30, 2019 refusal to accept Nomination).)

**FIRST COUNTERCLAIM**
**Breach of Contract – ITC-101 and Gathering and Processing Agreement**

135.    EdgeMarc incorporates Paragraphs 85 through 134 as though fully set forth herein.

136.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

137.    EdgeMarc and ETC were parties to ITC-101, which was part of and subject to the Gathering and Processing Agreement, and which was validly terminated by EdgeMarc on January 29, 2019.

28

138.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019.

139.    ETC also breached its obligations under ITC-101 and the Gathering and Processing Agreement by failing to gather and deliver EdgeMarc's gas. The Gathering and Processing Agreement provides that "[ETC] agrees to accept, or cause to be accepted, on a Firm basis those daily quantities of [EdgeMarc]'s Gas as set forth in any [ITC] . . . ." (Gathering and Processing Agreement at § 6.3). ETC failed to accept the required quantities of EdgeMarc's natural gas and its performance was not excused by Force Majeure.

140.    As a result of the breaches by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

## SECOND COUNTERCLAIM
### Breach of Contract – Gathering and Processing Agreement

141.    EdgeMarc incorporates Paragraphs 85 through 140 as though fully set forth herein.

142.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

143.    ETC breached its obligations under the Gathering and Processing Agreement by failing to accept EdgeMarc's Nominations for natural gas for February 2019 and for subsequent periods.

144.    As a result of the breach by ETC, EdgeMarc has been damaged in an amount to be determined at trial.

## THIRD COUNTERCLAIM
### Declaratory Judgment

145.    EdgeMarc incorporates Paragraphs 85 through 144 as though fully set forth herein.

146.    EdgeMarc and ETC are parties to the Gathering and Processing Agreement, which is a valid and binding contract governed by the laws of the Commonwealth of Pennsylvania.

147.    EdgeMarc and ETC were parties to ITC-101 and ITC-102, which were part of and subject to the Gathering and Processing Agreement.

148.    EdgeMarc and ETC have a dispute regarding their rights and obligations under the Agreements.

149.    ETC breached its obligations under the Gathering and Processing Agreement and ITC-101 by failing to put the Revolution System "in commercial service." As a result, ETC failed to meet ITC-101's "Guaranteed In-Service Date" of January 1, 2019. EdgeMarc was therefore entitled to terminate ITC-101 "upon written notice to [ETC] within thirty (30) Days of the Guaranteed In-Service Date." (ITC-101 at 5). On January 29, 2019, EdgeMarc validly terminated ITC-101 and ITC-102 by written notice to ETC.

150.    ETC has expressly asserted that ITC-101 and ITC-102 remain in force.

151.    On various dates through and including February 22, 2019, ETC issued invoices to EdgeMarc under ITC-101 for certain natural gas that was never gathered, processed, or delivered under ITC-101.

152.    EdgeMarc has expressly disputed such invoices.

WHEREFORE, EdgeMarc seeks a judgment: (1) declaring that EdgeMarc validly terminated ITC-101 and ITC-102 effective January 29, 2019; and (2) declaring that the invoices issued by ETC on various dates through and including February 22, 2019 – including those purportedly issued under ITC-101 – were not properly issued and/or that EdgeMarc rightfully withheld payment on such invoices following ETC's nonperformance under the Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, EdgeMarc demands judgment against ETC as follows:

a) Dismissing the Complaint against it with prejudice;

b) Awarding EdgeMarc damages in excess of the arbitration jurisdictional limits of the Court, in an amount to be determined;

c) Pre-judgment and post-judgment interest;

d) Equitable relief, including a preliminary and permanent injunction;

e) Declaratory relief;

f) Awarding attorneys' fees and costs; and

g) Granting such other legal and equitable relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 27, 2019

/s/ Megan S. Haines
Megan S. Haines
McGuireWoods, LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
Phone: 412.667.6000
Fax: 412.667.6050
mhaines@mcguirewoods.com

31

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
212-450-4351
lara.buchwald@davispolk.com
(Motion for Admission *Pro Hac Vice*
forthcoming)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer, New Matter and Counterclaim has been served on counsel of record for Plaintiff by e-mail and first class mail delivery on this 27th day of February 2019, addressed as follows:

Stuart H. Sostmann, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Union Trust Building
501 Grant Street, Suite 700
Pittsburgh, PA 15219

*/s/ Megan S. Haines*

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

ETC NORTHEAST PIPELINE, LLC

    Plaintiff and Counterclaim Defendant,

    v.

EM ENERGY PENNSYLVANIA, LLC

    Defendant and Counterclaim Plaintiff

CIVIL DIVISION

No. GD-19-002052

**Code:** 180 Declaratory Judgment

**EXHIBITS IN SUPPORT OF ANSWER, NEW MATTER AND COUNTERCLAIMS**

Filed on behalf of Defendant, EM ENERGY PENNSYLVANIA, LLC

Counsel of Record for this Party:

Megan S. Haines, Esquire
Pa. I.D. No. 203590
McGuireWoods, LLP
Tower 260 18th Floor
260 Forbes Avenue
Pittsburgh, PA 15222
(412) 667-7920 – phone
(412) 402-4195 – fax

*Of Counsel*:
Lara Samet Buchwald
NY ID No. 4700944
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
lara.buchwald@davispolk.com
212-450-4351
(Motion for Admission *Pro Hac Vice* forthcoming)

**JURY TRIAL DEMANDED**


EXHIBIT

E

# EXHIBIT A